**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | § Chapter 11 |
| | § |
| THE PENN TRAFFIC COMPANY, *ET AL.*[1] | § Case No. 09-14078 (PJW) |
| | § |
| Debtors. | § Jointly Administered |
| | § |
| | § Hearing Date: December 10, 2009 at TBD |
| | § (PROPOSED) |
| | § Objection Deadline: December 9, 2009 at |
| | § 12:00 p.m. (PROPOSED) |

**DEBTORS' EXPEDITED MOTION FOR ORDERS: (I)(A) APPROVING BID PROCEDURES, STALKING HORSE PURCHASER AND ASSET PURCHASE AGREEMENT RELATING TO SALE OF FOUR SUPERMARKETS: MASSENA, DESIGNATED AS STORE #3188; POTSDAM, DESIGNATED AS STORE #3125; CANTON, AND A PHARMACY CONTAINED THEREIN, DESIGNATED AS STORE #3090; GOUVERNEUR, DESIGNATED AS STORE #3060; AND (B) APPROVING BREAKUP FEE TO STALKING HORSE PURCHASER, (C) SCHEDULING A HEARING TO CONSIDER THE SALE, (D) APPROVING THE FORM AND MANNER OF NOTICE OF SALE BY AUCTION, (E) ESTABLISHING PROCEDURES FOR NOTICING AND DETERMINING CURE AMOUNTS FOR EXECUTORY CONTRACTS, AND (F) GRANTING RELATED RELIEF; AND (II)(A) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF ASSETS OUTSIDE THE ORDINARY COURSE OF BUSINESS, (B) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS, (C) AUTHORIZING THE ASSUMPTION AND SALE AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (D) GRANTING RELATED RELIEF**

The Penn Traffic Company, Sunrise Properties, Inc., Pennway Express, Inc., Penny Curtiss Baking Company, Inc., Big M Supermarkets, Inc., Commander Foods Inc., P and C Food Markets Inc. of Vermont, P.T. Development, LLC, and P.T. Fayetteville/Utica, LLC (collectively, the "Debtors"), as debtors in possession, file this expedited motion (the "Motion")

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: The Penn Traffic Company (6800), Sunrise Properties, Inc. (4868), Pennway Express, Inc. (0863), Penny Curtiss Baking Company, Inc. (6750), Big M Supermarkets, Inc. (8022), Commander Foods Inc. (8023), P and C Food Markets Inc. of Vermont (5531), P.T. Development, LLC (8594), and P.T. Fayetteville/Utica, LLC (8582). The mailing address for all Debtors is: P.O. Box 4737, Syracuse, NY 13221-4737.

pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry of two orders: (a) the first order, substantially in the form annexed hereto as **Exhibit B** (the "Bid Procedures Order"), (i) approving the procedures (the "Bid Procedures") substantially in the form annexed hereto as **Exhibit C**, including the Breakup Fee as set forth below and in the asset purchase agreement (the "Agreement") between Penn Traffic and Price Chopper Operating Co., Inc., a New York corporation ("Price Chopper" or the "Stalking Horse Purchaser"),[2] with respect to the proposed sale (the "Sale") of certain of the assets relating to four of the Debtors supermarkets (as discussed in greater detail below, the "Acquired Assets"), (ii) scheduling a hearing (the "Sale Hearing") on the Sale and setting objection and bidding deadlines with respect to the Sale, (iii) approving the form and manner of notice of an auction for the Acquired Assets (the "Auction"), (iv) establishing procedures to determine cure amounts and deadlines for objections for certain executory contracts and leases to be assumed and assigned by the Debtor(s) (the "Assumed and Assigned Agreements"), and (v) granting related relief; and (b) the second order, substantially in the form annexed hereto as **Exhibit D** (the "Sale Order"), (i) authorizing the Sale pursuant to the Agreement free and clear of liens, claims, encumbrances, and interests, a copy of which is attached hereto as **Exhibit E**, (ii) authorizing and approving the Agreement, (iii) authorizing the assumption and sale of the Assumed and Assigned Contracts, and (iv) granting related relief, and respectively state as follows:

---

[2]  This Motion and corresponding Bid Procedures contemplates that there may be more than one Stalking Horse Purchaser which purchases only a portion of the Acquired Assets.  This Motion should be read to include this concept.

# I.   JURISDICTION AND VENUE

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

# II.   BACKGROUND

## A.   General

2.    On November 18, 2009 (the "Petition Date"), the Debtors commenced their reorganization cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  All of the Debtors cases have been consolidated for administrative purposes only under Case No. 09-14078.

3.    The Debtors are continuing in possession of their assets and are operating their businesses, as debtors in possession, pursuant to Bankruptcy Code sections 1107 and 1108.

4.    On the Petition Date, Penn Traffic filed the Declaration of Ronald F. Stengel, in Support of First Day Relief (the "Stengel Declaration"), which is incorporated herein by reference, and shall constitute part of the evidentiary support for the Motion.

5.    The sale of the assets pursuant to the Agreement involves only The Penn Traffic Company ("Penn Traffic") and its bankruptcy estate.

## B.   The Debtors And Their Business

6.    Penn Traffic, a publicly-traded Delaware corporation, is one of the leading food retailers in the Northeastern United States, with annual revenues of approximately $872 million.  Penn Traffic operates approximately 79 supermarkets located throughout upstate New York, Pennsylvania, Vermont and New Hampshire operating under the "Bi-Lo," "P&C," and "Quality" trade names.   In addition to its retail operations, Penn Traffic provides transportation, warehousing, distribution, and retail support services for a certain portion of a wholesale grocery

distribution business owned by C&S Wholesale Grocers, Inc. ("C&S").  Penn Traffic's corporate offices are located at 1200 State Fair Blvd, Syracuse, New York 13221.

7.      Each of the Debtors serves a different function in the Debtors' present overall business structure, or is the corporate shell of discontinued operations.  Sunrise Properties, Inc. is a Pennsylvania corporation that owns and leases real property, primarily in connection with the Debtors' supermarket operations.  Pennway Express, Inc. is a Pennsylvania corporation that operates a trucking and freight business serving the Debtors' supermarket operations and third-party customers.  Penny Curtiss Baking Company, Inc. is a New York corporation that formerly operated the Debtors' commercial bakery business but presently is an inactive corporation.  Big M Supermarkets, Inc., a New York corporation, was a franchisor, wholesaler and service provider for various independent retail grocers, but is now an inactive corporation.  Commander Foods Inc. is a New York corporation that formerly was involved in the Debtors' private label business but presently is an inactive corporation.  P and C Food Markets Inc. of Vermont is a Vermont corporation that holds certain Vermont state licenses.  P.T. Development, LLC is a New York limited liability company that holds a 1% interest in P.T. Fayetteville/Utica, LLC. P.T. Fayetteville/Utica, LLC is a New York limited liability company that owns the real and personal property for a supermarket in Fayetteville, New York.

8.      Penn Traffic's retail food business dates back to 1854. Through a series of acquisitions and mergers, Penn Traffic, and its debtor subsidiaries (collectively, the "Debtors"), have grown to become a leader in the Northeastern United States retail food industry.

9.      Penn Traffic maintains its corporate offices at 1200 State Fair Blvd, Syracuse, New York 13221.

10.     The Debtors employ approximately 5,700 persons in their grocery stores, distributions centers, trucking services, and corporate offices.  Approximately 5,300 employees are hourly workers while approximately 450 employees are salaried.  Of its 5,700 employees, approximately eighty-seven percent of the employees belong to a union.  Ninety-three percent of unionized employees belong to locals of the United Food and Commercial Workers union ("UFCW"), while seven percent belong to local units of the International Brotherhood of Teamsters union ("Teamsters").  The Debtors are party to fourteen collective bargaining agreements with locals of the UFCW and Teamsters.  Approximately 12.7% of the Debtors' employees are not members of a collective bargaining unit.  The Debtors' relations with their employees and their unions are generally good.

11.     The Debtors' supermarkets offer a broad selection of grocery, meat, poultry, seafood, dairy, fresh produce, delicatessen, bakery, and frozen food products.  The stores also offer non-food products and services such as heath and beauty care products, housewares, general merchandise, and pharmacy and floral items.  The retail store sizes and formats vary depending on the demographic conditions in each location.  Conventional, smaller store formats serve lower density populations, while full-service supermarkets of up to 75,000 square feet serve larger populations.

### C.     The Debtors' Debt Structure

12.     The Debtors are borrowers and guarantors under two different secured credit facilities and, as of the Petition Date, have total outstanding secured debt in the approximate principal sum of $63.2 million, plus accrued interest thereon.

13.     First Lien Credit Agreement.  Pursuant to that certain Credit Agreement dated as of April 13, 2005 (as amended, supplemented, amended and restated or otherwise modified, the "First Lien Credit Agreement"), among The Penn Traffic Company, Penny Curtiss Baking

Company Inc. and Big M Supermarkets, Inc., as borrowers (the "<u>Borrowers</u>"), Sunrise Properties, Inc., Pennway Express, Inc., Commander Foods Inc., P and C Food Markets Inc. of Vermont, P.T. Development, LLC, and P.T. Fayettville/Utica, LLC, as guarantors (the "<u>Guarantors</u>"), the lenders party from time to time thereto, (collectively, the "<u>First Lien Secured Lenders</u>"), General Electric Capital Corporation, for itself as a lender, and as agent to the First Lien Secured Lenders (the "<u>First Lien Agent</u>"), and other parties thereto, the First Lien Secured Lenders made loans and provided letters-of-credit and other financial accommodations to the Debtors. The First Lien Credit Agreement provides for (1) a revolving credit facility ("<u>Revolving Facility</u>") in the aggregate principal amount of $50,000,000, inclusive of a letter of credit sub-facility (the "<u>Letter of Credit Facility</u>") in the aggregate principal amount of $47,500,000, and a swing line facility ("<u>Swing Line Facility</u>") in the aggregate principal amount of $7,500,000, and (2) a term loan (the "<u>Term Loan</u>") in the aggregate principal amount of $6,000,000. As of the Petition Date, the Debtors' joint and several obligations under the First Lien Credit Agreement included (a) outstanding Revolving Credit Facility, inclusive of all outstanding Letter of Credit Facility obligations, balances in the amount of $35,847,395, plus any accrued and unpaid interest, fees, costs and expenses thereunder, and (b) unpaid principal under the Term Loan in the amount of $6,000,000 plus any accrued and unpaid interest, fees, costs and expenses thereunder (collectively, the "<u>First Lien Prepetition Secured Obligations</u>").

14. <u>First Lien Security Agreement</u>. Pursuant to that certain security agreement, certain mortgages, certain pledge agreements, certain guaranties, and that certain intellectual property security agreement, all dated as of April 13, 2005 (as amended, supplemented, amended and restated or otherwise modified, the "<u>First Lien Security Agreement</u>" and together with the First Lien Credit Agreement and all related documents, the "<u>First Lien Secured Financing</u>

Documents"), between the Debtors and the First Lien Agent, the Debtors granted to the First Lien Agent, for the benefit of itself and the First Lien Secured Lenders, valid and perfected first-priority continuing liens on and security interests in (the "First Lien Prepetition Liens") substantially all of the Debtors' property, including all proceeds thereof (collectively, the "Prepetition Collateral") other than Supplemental Loan Priority Collateral (as defined in the Intercreditor Agreement (as defined below)) in which the First Lien Secured Lenders have a second-priority lien as more fully set forth in the First Lien Security Agreement and the Intercreditor Agreement, as security for the First Lien Prepetition Secured Obligations.

15. <u>Second Lien Credit Agreement</u>. Pursuant to that certain credit agreement dated as of April 13, 2005 (as amended, supplemented, amended and restated or otherwise modified, the "Second Lien Credit Agreement"), among the Borrowers, the Guarantors, the lenders party from time to time thereto (collectively, the "Second Lien Secured Lenders" together with the First Lien Secured Lenders, the "Secured Lenders"), Kimco Capital Corp., for itself as a lender, and as agent to the Second Lien Secured Lenders (the "Second Lien Agent" together with the First Lien Agent, the "Agents"), and other parties thereto, the Second Lien Secured Lenders made loans and other financial accommodations to the Debtors. The Second Lien Credit Agreement provides for a term loan (the "Second Lien Term Loan") in the aggregate principal amount of $10,000,000. As of the Petition Date, the Debtors were jointly and severally obligated under the Second Lien Credit Agreement, including in respect of unpaid principal under the Second Lien Term Loan in the amount of $10,000,000, plus any unpaid, accrued and accruing interest, fees, costs and expenses thereunder (including attorneys' fees and legal expenses) (the "Second Lien Prepetition Secured Obligations", together with the First Lien Prepetition Secured Obligations, the "Prepetition Secured Obligations").

16. <u>Second Lien Security Agreement</u>.  Pursuant to that certain security agreement, certain mortgages, certain pledge agreements, certain guaranties, and that certain intellectual property security agreement, all dated as of April 13, 2005 (as amended, supplemented, amended and restated or otherwise modified, the "<u>Second Lien Security Agreement</u>", together with the Second Lien Credit Agreement and all related documents, the "<u>Second Lien Secured Financing Documents</u>", and together with the First Lien Secured Financing Documents, the "<u>Secured Financing Documents</u>") between the Debtors and the Second Lien Agent, the Debtors granted to the Second Lien Agent, for the benefit of itself and the Second Lien Secured Lenders, valid and perfected second-priority continuing liens on and security interests (the "<u>Second Lien Prepetition Liens</u>", together with the First Lien Prepetition Liens, the "<u>Prepetition Liens</u>") in substantially all of the Prepetition Collateral, other than the Supplemental Loan Priority Collateral in which the Second Lien Secured Lenders have a first-priority lien, as more fully set forth in the Second Lien Security Agreement and the Intercreditor Agreement, as security for the Second Lien Prepetition Secured Obligations.

17. On November 19, 2009 this Court entered that certain Order (a) Authorizing the Debtors' Use of Cash Collateral by Consent, (b) Authorizing Postpetition Letter of Credit Financing, (c) Granting Adequate Protection and (d) Scheduling A Final Hearing, providing for the Debtors use of cash collateral of the Debtors' First Lien and Second Lien Prepetition Lenders (the "<u>Prepetition Lenders</u>") (the "<u>Cash Collateral Order</u>").  The Cash Collateral Order granted the Prepetition Lenders postpetition liens, security interests and priority claims as set forth therein.

18. The Sale proposed in this Motion shall be free and clear of all prepetition and postpetition liens, claims, encumbrances and interests of the Prepetition Lenders.

###### D.    Additional Dispositions

19.    In addition to the proposed transaction described herein, the Debtors are also entering into an additional transaction in order engage an agent to sell on a going concern and/or going out of business basis, the bulk of the Debtors' other assets.

### III.    THE PROPOSED SALE

20.    Pursuant to the Agreement, Penn Traffic propos to sell the Acquired Assets to the Stalking Horse Purchaser(s) or other bidder with the highest or otherwise best bid(s) free and clear of liens, claims, encumbrances and interests, including, without limitation, labor, employment, collective bargaining agreements and pension obligations, with such liens, claims, encumbrances and interests to attach to the sale proceeds.  The sale proceeds will be distributed to creditors and interest holders pursuant to a plan of liquidation or other order of the Court.

21.    Generally, the assets to be  purchased by Price Chopper are described as follows: (a) the equipment, machinery, tools, implements, displays, furniture, fixtures and improvements of Seller used by Seller in connection with its business at the Supermarkets; (b) the Canton Supermarket Building; (c) the Gouverneur Supermarket Land and Building; (d) those Contracts listed on Schedule 1.1(d) of Exhibit A-1 as an Acquired Contract (collectively, the "Acquired Contracts"); (e) the Pharmacy Records including access to computer files in respect thereto; and (f) the unexpired Pharmacy Inventory, all supplies and other inventories not held for resale and all other items of personal property not specifically excluded in section 1.2 of the Agreement; and (g) phone numbers for the Supermarkets, including the Pharmacy (collectively (a) through (g), the "Acquired Assets").  The specific assets and Acquired Contracts to be purchased by Price Shopper for each of the Supermarkets are set out in Schedules 1.1(a) and 1.1(d) of the Agreement, Exhibit A hereto.

22.     The sale proceeds and other consideration realized by virtue of the Sale will be distributed to creditors and interest holders pursuant to a plan of liquidation or other order of the Court.

23.     The four supermarkets involved in this transaction are: (i) Massena, designated as Store #3188 located in Massena, New York; (ii) Potsdam, designated as Store #3125 located in Potsdam, New York; (iii) Canton, including a pharmacy contained therein, designated as Store #3090 located in Canton, New York; and (iv) Gouverneur, designated as Store #3060 located in Gouverneur, New York (collectively (i) through (iv) herein,  the "Supermarkets").

24.     Prior to the Petition Date, on October 22, 2009, Price Chopper submitted an offer to Penn Traffic to acquire certain assets relating to the Supermarkets for the Total Consideration of $12,300,000 cash, plus the assumption of certain liabilities relating to contracts to be assumed and assigned to Price Chopper.

25.     Since the receipt of the offer, the parties have been in negotiations to finalize the terms of the sale.  The Agreement represents the culmination of an extensive negotiation process conducted by the Debtors and their advisors and the Stalking Horse Purchaser and its advisors. The Debtors and the Stalking Horse Purchaser entered into the Agreement on December 4, 2009.

26.     The following paragraphs in this section summarize key provisions of the Agreement, but are qualified in their entirety by reference to the Agreement.[3]

     a.     Acquired Assets. (a)  the equipment, machinery, tools, implements, displays, furniture, fixtures and improvements of Seller used by Seller in connection with its business at the Supermarkets;  (b)  the Canton Supermarket Building;  (c)  the Gouverneur Supermarket Land and Building;  (d)  the Acquired Contracts;  (e)  the Pharmacy Records including

---

[3]   Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Agreement attached hereto as **Exhibit E**, or the Bid Procedures attached hereto as **Exhibit C**, as applicable.

access to computer files in respect thereto; (f) the unexpired Pharmacy Inventory, all supplies and other inventories not held for resale and all other items of personal property not specifically excluded in section 1.2 of the Agreement; and (g) phone numbers for the Supermarkets, including the Pharmacy.

b.  <u>Purchase Price</u>. The aggregate consideration for the sale, transfer, assignment and conveyance of the Acquired Assets will be (a) $12,300,000 in cash, and (b) the assumption by Buyer of the Assumed Liabilities (as defined in the Agreement).

c.  <u>Deposit</u>. $250,000 paid to the Debtors to be applied to the purchase price upon closing of the transaction. In the event of a breach of the Agreement by the Purchaser, the deposit shall be forfeited to the Debtors/Seller as part of the of damages to Seller for breach by Purchaser with all other right and remedies against Purchaser preserved in favor of Debtors/Sellers Debtors for breach. The treatment of the Deposit is addressed in Article 2 of the Agreement.

d.  <u>Breakup Fee</u>. The Stalking Horse Purchaser shall be entitled to the payment of a breakup fee in the amount of 3% of the Purchase Price, which is paid to the Stalking Horse Purchaser in accordance with the Agreement if the Court, in such an event enters an order approving the sale of the Acquired Assets to a Successful Bidder other than the Stalking Horse Purchaser.

e.  <u>Closing and Other Deadlines</u>. Closing is conditional, upon satisfaction of conditions precedent set forth in Article 7 of the Agreement.

## IV.   <u>RELIEF REQUESTED</u>

27.    By this Motion, the Debtors seek the entry of two orders of this Court: (i) the Bid Procedures Order (a) approving the Bid Procedures, including a payment of a breakup fee and expense reimbursement to the Stalking Horse Purchaser, with respect to the Sale of the Acquired Assets, (b) scheduling the Sale Hearing and setting objection and bidding deadlines with respect to the Sale, (c) approving the form and manner of notice of the Auction, (d) establishing procedures to determine cure amounts and deadlines for objections for the Assumed and Assigned Agreements, and (e) granting related relief; and (ii) the Sale Order (a) authorizing the Sale free and clear of liens, claims, encumbrances, and interests including claims and interests

relating to or arising under labor, employment and collective bargaining agreements, pursuant to the Agreement, (b) authorizing and approving the Agreement, (c) authorizing the assumption and sale of the Assumed and Assigned Agreements, and (d) granting related relief.

## V.        PROPOSED BID PROCEDURES

28.        The Debtors desire to receive the greatest value for the Acquired Assets. Although the Debtors and their professionals have undertaken prepetition efforts to market the Acquired Assets, in order to reach a broader pool of possible purchasers and to seize on possible sale opportunities before any devaluation of the Acquired Assets, the Debtors believe that it is imperative that they promptly move forward with an auction process to maximize the likelihood of higher and better offers being generated for the Acquired Assets.  Accordingly, the Bid Procedures (as summarized below) were developed to expedite the sale process, and with the objective of promoting further active bidding that will result in the highest or best offer the marketplace can generate for the Acquired Assets while affording appropriate protection to the Stalking Horse Purchaser.  Moreover, the Bid Procedures reflect the Debtors' objective of conducting the Auction in a fair, and open process that promotes interest in the Acquired Assets by financially-capable, motivated bidders who are likely to close a transaction.

### E.        Bid Procedures

29.        The Bid Procedures are typical for asset sales of this size and nature, and include provisions for consultation with the Committee, a deposit requirement, a breakup fee to the Stalking Horse Purchaser and a requirement that a bidder be a "Qualified Bidder" as defined in the Bid Procedures.

30.     Pursuant to Rule 6004-1 Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"),[4] the following is a summary of certain key provisions of the proposed Bid Procedures:[5]

(a)     Participation Requirements For New Alternative Bidders

(i)     Confidentiality Agreement. An executed confidentiality agreement in form and substance reasonably acceptable to the Debtors (each a "Confidentiality Agreement"); and

(ii)    Proof of Financial Ability to Perform. The most current audited and latest unaudited financial statements (collectively, the "Financials") of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of the Proposed Sale, Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure evidencing the Potential Bidder's ability to close the Transaction, the sufficiency of which shall be determined by the Debtors, in consultation with the First Lien Agent, in their reasonable discretion.

(b)     Qualified Bid

(i)     Modified Agreement. A Bid shall include a black-lined copy of the Agreement (the "Modified Agreement") to show all changes requested by the Bidder, including those related to the Purchase Price; provided, however, that the terms of the Modified Agreement are substantially the same or better than the terms of the Agreement.

(ii)    Acquired Assets. Each bid or partial bid (the "Bid") shall be for all of the Acquired Assets; provided, however, that the Debtors may consider a combination of multiple Bids, each of which is for less than all of the Acquired Assets, so long as (i) such combination of Bids collectively offers an aggregate amount equal to the

---

[4]  Local Rule 6004-1(c) requires the Bid Procedures Order to: (i) specify the date, time, and place of the Auction and then method for providing notice of any changes thereto; (ii) each bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale; (iii) the Auction will be conducted openly and all creditors will be permitted to attend provided that advance written notice is given to the Notice Parties; and (iv) the Auction will be transcribed or videotaped.

[5]  The description of the Bid Procedures contained in this Motion is for informational purposes only, and in the event of any inconsistency between this description and the terms of the Bid Procedures, the Bid Procedures shall control.

Minimum Initial Bid (defined below), and (ii) each Bid comprising such combination otherwise meets the requirements of a Qualified Bid.

(iii) <u>Contingencies and Conditions</u>. A Bid may not be conditioned on obtaining internal approval or on the outcome or review of due diligence, but may be subject to verifying the accuracy in all material respects at the closing of specified representations and warranties or the satisfaction in all material respects at the closing of specified conditions, none of which shall be more burdensome than those set forth in the Agreement. There shall not be any due diligence of financing contingencies.

(iv) <u>Authorization to Bid</u>. A Bid shall include evidence of authorization and approval from such Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified Agreement.

(v) <u>Good Faith Deposit</u>. Each Bid must be accompanied by a cash deposit in an amount equal to 10% of the Bid (the "Good Faith Deposit''). The Disposition of the Deposit shall be in accordance with the terms of the Agreement and order of the Bankruptcy Court. The Good Faith Deposit of the Successful Bidder shall be applied to the Purchase Price of such transaction at Closing. The Good Faith Deposits of all other Qualified Bidders shall be held in an interest-bearing escrow account until the Termination Date, and thereafter returned to the respective bidders. If a Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors shall be entitled to retain the Good Faith Deposit as part of their damages resulting from the breach or failure to perform by the Successful Bidder. Recourse of the Debtor is not limited to the event of breach by the Successful Bidder.

(vi) <u>Minimum Initial Bid Requirement</u>. Each Qualified Bidder's Bid or Combination Bid shall have an initial minimum bid requirement equal to the sum of (i) the Purchase Price, (ii) the Breakup Fee, and (iii) $250,000 (the "Minimum Initial Bid").

(vii) <u>Other Evidence to Support Closing a Sale</u>. Each Bid must contain evidence satisfactory to the Debtors, in consultation with the First Lien Agent, that the bidder is reasonably likely (based on availability of financing, experience and other considerations) to be able to timely consummate a purchase of the relevant assets if selected as the Successful Bidder (as defined below).

(c)     Bid Deadline. The deadline for submitting bids by a Qualified Bidder shall be **December 21, 2009, at 12:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline"). A Bid received after the Bid Deadline shall not constitute a Qualified Bid (as defined below)

(d)     Overbid and Increments of Bidding. An initial overbid shall be in the amount of the (i) the Purchase Price, (ii) the Breakup Fee, and (iii) $250,000. Subsequent Bids shall be in an amount in increments of $100,000.

(e)     Auction. In the event that the Debtors receive at least one (1) Qualified Bid (other than from the Stalking Horse Purchaser) of the Acquired Assets by the Bid Deadline, the Debtors shall conduct an auction (the "Auction") to determine the highest and otherwise best bid with respect to the Acquired Assets. No later than December 22, 2009 at 4:00 p.m. (prevailing Eastern time), the Debtors will notify all Qualified Bidders of (i) the highest or otherwise best Qualified Bid, (the "Baseline Bid") and (ii) the time and place of the Auction. The Auction shall commence at 9:00 a.m., (prevailing Eastern time) on December 29, 2009, 2009 at the offices of Morris, Nichols, Arsht & Tunnell, LLP, 1201 N. Market St., 18th Floor, Wilmington, DE 19801.

(f)     Sale Hearing. The Sale Hearing shall be conducted by the Bankruptcy Court on or before December 30, 2009.

(g)     Closing with Alternate Bidder. In the event the Successful Bidder fails to consummate the sale as a result of the Successful Bidder's default or breach under the applicable purchase agreement, the Debtors shall: (i) retain the Successful Bidder's Good Faith Deposit as liquidated damages; and (ii) be free, but under no obligation, to enter into a new purchase agreement with the next most appropriate Qualified Bidder (the "Alternate Bidder") at the highest price bid by such Qualified Bidder at the Auction (the "Alternate Bid"). In such event, the Debtors desire to proceed with the Alternate Bidder, the Alternate Bidder shall be obligated to fund and close the transaction on the Alternate Bid.

31.     The Debtors expressly reserve the right to modify the Bid Procedures with the consent of the First Lien Agent and the Buyer. Moreover, the Debtors, reserve the right, upon notice to all Notice Parties and those parties that have demonstrated an interest in bidding on the Acquired Assets and with the consent of the First Lien Agent, to: (a) waive terms and conditions set forth herein with respect to any or all potential bidders; (b) impose additional terms and conditions with respect to any or all potential bidders; (c) extend the deadlines set forth herein;

(d) cancel the sale of the Acquired Assets and/or Sale Hearing in open court without further notice; and (e) amend the Bid Procedures as they may determine to be in the best interests of their estates or to withdraw the Motion at any time with or without prejudice.

### F. Proposed Stalking Horse Bidding Protections - Breakup Fee

32.     As part of the Bid Procedures, the Debtors are seeking approval of the provisions of the Agreement regarding the payment of a breakup fee in the amount of 3% of the Purchase Price (the "Breakup Fee"), which is paid to the Stalking Horse Purchaser in accordance with the Agreement if the Court, in such an event enters an order approving the sale of the Acquired Assets to a Successful Bidder (an "Alternative Transaction") other than the Stalking Horse Purchaser. Further, the Breakup Fee is reasonable and is consistent with the size of breakup fees in transactions like this one. Most important, the Breakup Fee is meant to protect value to the estate to best ensure a robust auction for alternate bidders, while having a safety net for the Debtor with the Stalking Horse Purchaser bid already in hand.

33.     The Breakup Fee shall be paid exclusively from cash consideration paid to the Debtors by an alternative bidder in an Alternative Transaction, and not from any other cash of the Debtors.

### G. Notice of Auction and Sale Hearing

34.     The Debtors seek to have the Auction scheduled for a date no later than December 29, 2009. The timing of the Auction is consistent with milestones embodied in the Cash Collateral Order dated November 30, 2009, which remains effective in this case. The Debtors request that the Sale Hearing be scheduled immediately after the Auction, or no later than December 30, 2009. In addition to being required by the terms of the Agreement and the Cash Collateral Order, it is important to preserve the value of the Supermarkets for the estates and their creditors by conducting the Auction on an expedited time frame.

35.     Not later than one business day after the entry of the Bid Procedures Order, the Debtors will serve copies of the Sale Notice, substantially in the form attached hereto as **Exhibit F** (the "Sale Notice"), the Bid Procedures, and the Bid Procedures Order by mail, postage prepaid to: (a) all entities known to have expressed a *bona fide* interest in acquiring the Acquired Assets (by overnight mail); (b) counsel to the Debtors prepetition lenders; (c) the Office of the United States Trustee for the District of Delaware; (d) known entities holding or asserting a security interest in or lien against any of the Acquired Assets; (e) taxing authorities whose rights may be affected by a sale of the Acquired Assets; (f) all government agencies required to receive notice of proceedings under the Bankruptcy Rules; (g) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (h) all labor unions through their bargaining representatives and (i) all parties that have requested notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of entry of the Bid Procedures Order.

36.     The Debtors further request, pursuant to Bankruptcy Rule 9014, that objections, if any, to the proposed Sale: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"); (c) be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington, Delaware 19801, by 4:00 p.m. (prevailing Eastern Time) on December 23, 2009 (the "Objection Deadline"); and (d) be served so as to be received by the Objection Deadline by:

(i)      the Debtors, c/o The Penn Traffic Company, 1200 State Fair Blvd., Syracuse NY, 13221, Attn: Ronald F. Stengel, CRO;

(ii)     counsel to the Debtors, Haynes and Boone, LLP, 1221 Avenue of the Americas, New York, NY 10020, Attn: Michael E. Foreman and Lenard M. Parkins, and Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market St., P.O. Box 1347, Wilmington, DE 19899-1347, Attn: Gregory W. Werkheiser , Esq.;

(iii)    counsel to Price Chopper, Harter, Secrest & Emery, LLP, Twelve Fountain Plaza, Suite 400, Buffalo, NY 14202-2293, Attn: Raymond L. Fink, Esq.;

(iv)    counsel to the Committee, Otterbourg, Steindler, Houston & Rosen, P.C., 230 Park Avenue, New York, NY, 10169-0075, Attn: Scott Hazan, Esq.; and

(v)    the Office of the United States Trustee (the "U.S. Trustee"), 844 King Street, Suite 2207, Wilmington, DE 19801.

(the "<u>Objection Service Parties</u>").

**H.**    **<u>Procedures to Determine Cure Amounts and Deadlines for Objection to the Assumption and Assignment of the Assumed and Assigned Agreements</u>**

37.    To facilitate and affect the Sale, the Debtors will be required to assume and/or assign the Assumed and Assigned Agreements to the Stalking Horse Purchaser, or as applicable, to the Alternate Successful Bidder. The Debtors expect that the Assumed and Assigned Agreements will be a subset (as designated by the Stalking Horse Purchaser or Alternate Successful Bidder) of the executory contracts and unexpired leases to which one or more of the Debtors is a party (collectively, the "<u>Assignable Agreements</u>").

38.    Given the need to transfer certain executory contracts to the Stalking Horse Purchaser, the Debtors seek to establish (a) procedures for determining cure amounts through the closing date of the Sale; and (b) the deadline for objections to the potential assumption and/or assignment of the Assignable Agreements in connection with the Sale (collectively, the "<u>Cure Procedures</u>").

39.    On or prior to the date of entry of the Bid Procedures Order, or as soon thereafter as is practicable, the Debtors will file with the Court an initial list of cure amounts for the Assignable Agreements. The Debtors reserve the right to supplement or modify the list of cure

amounts for the Assignable Agreements at any time prior the commencement of the Sale Hearing.

40.     Additionally, the Debtors will prepare and distribute to non-Debtor parties to the Assignable Agreements a notice, substantially in the form annexed hereto as **Exhibit G** (the "Cure Notice"), listing: (a) the Assignable Agreement(s); and (b) the Cure Amount(s), if any.  If the Stalking Horse Purchaser is not the Successful Bidder at the Auction, no later than two (2) business days after the Auction, the Debtors shall send a subsequent Cure Notice, to all non-Debtor parties to executory contracts or unexpired leases to be assigned to the Successful Bidder that were not initially identified as Assignable Agreements.

41.     To facilitate a prompt resolution of cure disputes and objections relating to the assumption and assignment of the Assumed and Assigned Agreements, the Debtors propose the following deadlines and procedures:

(a)     The non-Debtor parties to the Assignable Agreements shall have until 4:00 p.m. (prevailing Eastern Time) on December 23, 2009 (the "Agreement Objection Deadline"), which deadline may be extended in the sole discretion of the Debtors, to object ("Agreement Objection") to: (i) the cure amounts listed by the Debtors and to propose alternative cure amounts; and/or (ii) the proposed assumption and/or assignment of the Assignable Agreements in connection with the Sale; provided, however, if the Stalking Horse Purchaser is not the Successful Bidder at the Auction, and the Debtors send a Cure Notice to a non-Debtor party to an Assignable Agreement, or if the Debtors otherwise amend the Cure Notice to add a contract or lease or to reduce the cure amount thereof, except where such reduction was upon mutual agreement of the parties, the non-Debtor parties thereto shall have until the commencement of the Sale Hearing to submit an Agreement Objection (the "Amended Agreement Objection Deadline").

(b)     Any party objecting to the cure amounts or objecting to the potential assumption and/or assignment of such Assignable Agreement(s), shall be required to file and serve an Agreement Objection, in writing, setting forth with specificity any and all cure obligations that the objecting party asserts must be cured or satisfied in respect of the Assignable Agreements(s), as applicable, and/or any and all objections to the potential assumption and/or assignment of such agreements, together with all documentation

supporting such cure claim or objection, upon the Notice Parties, so that the Agreement Objection is received no later than 4:00 p.m. on the Agreement Objection Deadline or the Amended Agreement Objection Deadline, as applicable. Where a nondebtor counterparty to an Assignable Agreement files an objection asserting a cure amount higher than the proposed cure amounts (the "Disputed Cure Amount"), then (i) to the extent that the parties are able to consensually resolve the Disputed Cure Amount prior to the Sale Hearing, and subject to the consent of the Stalking Horse Purchaser (or the Successful Bidder) of such consensual resolution, the Debtors shall promptly provide any Committee and the Stalking Horse Purchaser (or the Successful Bidder) notice and opportunity to object to such proposed resolution; or (ii) to the extent the parties are unable to consensually resolve the dispute prior to the Sale Hearing, then such objection will be heard at the Sale Hearing or thereafter.

42. Unless an objection to the assumption and assignment of an Assignable Agreement is filed and served before the Agreement Objection Deadline, all counterparties to the Assignable Agreements shall: (a) be forever barred from objecting to the proposed cure amounts and from asserting any additional cure or other amounts with respect to the Assignable Agreements, and the Debtors and Stalking Horse Purchaser (or the Alternative Successful Bidder) shall be entitled to rely solely upon the proposed cure amounts set forth in the Cure Notices; (b) be deemed to have consented to the assumption and assignment; and (c) be forever barred and estopped from asserting or claiming against the Debtors or Stalking Horse Purchaser (or the Successful Bidder) that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Assignable Agreements or that there is any objection or defense to the assumption and assignment of such Assignable Agreements to the Agreement or consummation of the Sale.

43. No Assignable Agreement will become an Assumed and Assigned Agreement that is assumed and assigned to the Stalking Horse Purchaser or other Successful Bidder, as applicable, until such time as the Sale Order has been entered and the transaction contemplated

by the Agreement or other purchase agreement of the other Successful Bidder, as applicable, has been consummated.

## **PROVISIONS THAT MAY IMPLICATE LOCAL RULE 6004-1(B)(IV)**

44.     Pursuant to Local Rule 6004-1(b)(iv), the Debtors are required to highlight certain provisions of this Motion relating to approval of the Sale and Bid Procedures, including:

(a)     <u>Agreements with Management</u>.     The Debtors and the Stalking Horse Purchaser have discussed the employment of certain of the Debtors' employees by the Stalking Horse Purchaser.     Section 5.3(d) of the Agreement contemplates that the Stalking Horse Purchaser may, but is not obligated to, offer employment to certain of the Debtors' employees, and that the terms of such employment will be at the Stalking Horse Purchaser's discretion.

(b)     <u>Indemnification</u>.     The Agreement provides for cross-indemnification provisions in section 9.2.

(c)     <u>Sale Free and Clear</u>. Unless otherwise provided in the Agreement, the Sale shall be free and clear of all liens, claims, encumbrances and interests, including those arising under or related to labor, employment, collective bargaining agreements, pension, ERISA, tax or other agreements or obligations of the Debtors as described in section 1.1 of the Agreement. See proposed Sale Order, findings U, W, X and Y and decretal paragraphs 61, 62 and 63.

(d)     <u>Closing Deadlines</u>.     Section 8.1 of the Agreement provides the Agreement may be terminated, *inter alia,* by: (a) the Stalking Horse Purchaser if (i) the Closing has not concluded by January 4, 2010 or (ii) if the Bankruptcy Court has not approved the Sale Order within 15 days of the Execution Date; (b) by the Stalking Horse Purchaser, any time on or after the 65th day from the execution date, if the Closing has not occurred; and (c) by the Debtors, any time on or after the 65th day from the execution date, if the Closing has not occurred.

(e)     <u>Good-Faith Deposit and Conditions for Forfeiture</u>. The Stalking Horse Purchaser shall provide a deposit in the amount of $250,000.  Each other Bid must be accompanied by a deposit in the form of cash or a certified bank check in the amount of 10% of the Bid.

(f)     <u>Use of Proceeds</u>.     The Proceeds from the Stalking Horse Purchaser's sale of the Acquired Assets shall be used in the following order to pay the claims of (i) the First Lien Secured Lenders, (iii) the Second Lien Secured Lenders, (iii) other creditors of the Debtors.  All with such liens, claims,

encumbrances and interests held by any creditor (including the First Lien Secured Lenders and the Second Lien Secured Lenders) shall attach to the sale proceeds from the sale of the Acquired Assets.

(g)     Tax Exemption.  N/A

(h)     Requested Findings as to Successor Liability.  See proposed Sale Order, finding U and decretal paragraph 83.

(i)     Relief from Bankruptcy Rule 6004(h).  The Debtors seek such relief with respect to the proposed Bid Procedures Order and the proposed Sale Order.  See paragraph 29 of the proposed Bidding Procedures Order and paragraph AA of the proposed Sale Order.

## VI.     ARGUMENT AND AUTHORITY IN SUPPORT OF THE MOTION

### I.     The Sale is Within the Sound Business Judgment of the Debtors and Should be Approved

45.     Bankruptcy Code section 363(b)(1) provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Bankruptcy Code section 363 does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets outside the ordinary course of business prior to confirmation of a plan.  However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors. *See In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143 (3d Cir. 1986); *see also Myers* v. *Martin (In re Martin),* 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders* v. *Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1071 (2d Cir. 1983); *Dai-Ichi Kangyo Bank, Ltd.* v. *Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.),* 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 176 (D. Del. 1991).

46.     The "business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business: (i) that a "sound

business purpose" justifies the sale of assets outside the ordinary course of business, (ii) that adequate and reasonable notice has been provided to interested persons, (iii) that the debtors have obtained a fair and reasonable price, and (iv) good faith. *Abbotts Dairies,* 788 F.2d 143; *Titusville Country Club* v. *Pennbank (In re Titusville Country Club),* 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd.,* 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989). In this case, the Debtors submit that the decision to proceed with the Sale and the Bid Procedures related thereto are based upon their sound business judgment and should be approved. A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.,* 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *Lionel*, 722 F.2d at 1071; *Montgomery Ward,* 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

47. Section 363(b) of the Bankruptcy Code provides, in pertinent part, that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 363(b) thus expressly authorizes a debtor in possession to sell estate assets prior to and outside a plan of reorganization. Section 363 is a grant of broad and flexible power to the bankruptcy court grounded in business judgment and practical reality. See *In re Martin*, 91 F.3d 989, 395 (3d Cir. 1996). In *Lionel*, 722 F.2d at 1070, the Second Circuit explained its sweep and the precedential standards. The court began with an historical overview of the bankruptcy provisions that have permitted the sale of a debtor's assets outside a final plan of liquidation or reorganization. 722 F.2d at 1066-68. The

court noted that initially such sales were permitted only where the property to be sold was "of a perishable nature, or likely to deteriorate in value." *Id*. at 1066 (quoting section 25 of the Bankruptcy Act of 1867, 14 Stat. 517).

48.     However, the standard evolved beyond "perishable" situations, to cases where property might lose value due to a broad range of economic exigencies. Thus, in *In re Penlow*, 209 F. 841 (2d Cir. 1913), for example, the court authorized a private sale of a stock of handkerchiefs during the Christmas season, noting that the value of the handkerchiefs "would decline greatly after the holidays." 722 F.2d at 1067. Still later, the *Lionel* court explained, the principle was further extended to instances where "a good business opportunity was presently available, *so long as the parties could act quickly*." 722 F.2d at 1069 (citing *In re Sire Plan, Inc.*, 392 F.2d 497 (2d Cir. 1964)) (emphasis added).

49.     Ultimately, an even broader standard emerged, as reflected in the seemingly unqualified language of section 363(b). 722 F.2d at 1069. Under that standard, as articulated in *Lionel*, a bankruptcy judge is afforded "considerable discretion" in determining whether to allow a sale prior to confirmation of a plan, but must "expressly find . . . a *good business reason* to grant such an application." 722 F.2d 1066, 1071 (emphasis added). *See also In re Montgomery Ward Holding Corp.,* 242 B.R. 147 (D.Del. 1999); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *Licensing By Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997); In re Delaware & Hudson Ry. Co., 124 B.R. 169 (D.Del. 1991); *In re Chateaugay Corp.*, 973 F.2d 141, 144 (2d Cir. 1992); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989).

50.     Additionally, Bankruptcy Code section 105(a) provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code.   Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).   Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *In re Fesco Plastics Corp.,* 996 F.2d 152, 154 (7th Cir. 1993); *Pincus* v. *Graduate Loan Ctr. (In re Pincus),* 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., Chinichian* v. *Campolongo (In re Chinichian),* 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.,* 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

51.     The Debtors submit that more than ample business justification exists to sell the Acquired Assets to Stalking Horse Purchaser or other Successful Bidder pursuant to the Bid Procedures.   As set forth more fully above and in the Stengel Declarations, prior to the Petition Date, the Debtors, acting through their board, officers and advisors implemented a marketing and sale process for the assets of the company designed to reach the strategic and financial buyers most likely to have an interest in the Debtors' assets and business.   Prior to the Petition Date, the Debtors and their advisors also devoted substantial resources and energy to examining ways in

which to restructure leases and other obligations to enhance the viability of the business going forward and to enhance the likelihood of a robust sale process.

52.     The consideration to be realized by the Debtors and its estate is fair, reasonable and negotiated at arms length and in good faith without collusions on the part of any party.

53.     An expedited and targeted postpetition sale process is further justified by exigencies deriving from the current business environment and the specific needs and vulnerabilities of the Debtors' business.  The Debtors operate in a highly competitive retail environment, made all the more so by the current adverse macroeconomic conditions.  Moreover, the Debtors' business model depends on skilled employees, strong customer confidence and establishing and maintaining long term customer relationships.  Accordingly, the viability of the Debtors' business is particularly vulnerable to the consumer and employee stigma of being perceived as "bankrupt", which will increase the longer the Debtors' business remains in chapter 11.  In addition, cash and liquidity for the Debtors' business are very limited.  There simply is not enough liquidity available to the Debtors for a more protracted sale process than proposed.  Thus, the relief sought herein is not only reasonable, but necessary, to maximize the value of the Debtors' estates for the benefit of their stakeholders.

54.     The Notice of Auction and the Sale is designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Acquired Assets.  Indeed, the Debtors and their professionals have marketed and will continue to market the Acquired Assets, and have picked a Stalking Horse Purchaser after soliciting the most likely interested competing bidders.  Accordingly, the proposed Sale satisfies the second prong of the *Abbotts Dairies* standard.

55. The Bid Procedures are designed to maximize the value received for the Acquired Assets. The process proposed by the Debtors allows for a timely and efficient, albeit expedited auction process, given the circumstances facing the Debtors, while providing bidders with ample time and information to submit a timely competing bid and to perform due diligence. The Bid Procedures are designed to ensure that the Acquired Assets will be sold for the highest or otherwise best possible purchase price. The Debtors are subjecting the value of the Acquired Assets to market testing and permitting prospective purchasers to bid on the Acquired Assets. The proposed Sale is a market check through the solicitation of competing bids in a court-supervised Auction pursuant to the Bid Procedures. Accordingly, the Debtors and all parties in interest can be assured that the consideration received for the Acquired Assets will be fair, reasonable and the highest and best under the circumstances. Therefore, the third prong of the *Abbotts Dairies* standard is satisfied. As discussed below, the "good faith" prong of the *Abbotts Dairies* standard is also satisfied here.

## J. The Immediate Sale of the Debtor's Assets is Necessary to Preserve the Business as a Going Concern - Time is of the Essence

56. As the *Lionel* court's discussion of section 363(b) makes clear, the quintessential "good business reason" on which reorganization courts have historically justified the sale of a debtor's property prior to a plan is when any delay in the sale of the property threatens to erode significantly the value of that property. *Lionel*, 722 F.2d at 1066-69; *see also In re V. Loewer's Gambrinus Brewery Co.*, 141 F.2d 747, 749 (2nd Cir. 1944). As the *Lionel* court stated, "[i]n such cases . . . the bankruptcy machinery should not straightjacket the bankruptcy judge so as to prevent him from doing what is best for the estate." *Lionel*, 722 F.2d at 1069.

57. Thus, courts applying 363(b) have routinely authorized the sale of a debtor's operating assets in advance of the plan process where the debtor did not have sufficient liquidity

to continue operating, and the cessation of operations was likely or certain to result in the debtor's inability to realize the going concern value of its business.[6]  As set forth in the Stengel Declaration this is the case here.  See *Trans World Airlines, Inc.*, 2001 WL 1820326 (Bkrtcy. D. Del. 2001).

### K.    The Sale is Proposed in "Good Faith" and the Successful Bidder is Entitled to the Protection of Bankruptcy Code section 363(m)

58.    The Debtors request that the Court find that the Successful Bidder is entitled to the benefits and protections provided by Bankruptcy Code section 363(m) in connection with the Sale.

59.    Bankruptcy Code section 363(m) provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

---

[6]    *See, e.g., Stephens Indus. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (approving sale of radio station where debtor lacked funds to continue operations and could lose broadcast license if station went off the air); In re *Brookfield Clothes, Inc.,* 31 B.R. 978 (S.D.N.Y. 1983) (approving sale of clothing manufacturer that had shut down due to lack of cash prior to petition date); *In re Lady H Coal Co., Inc.,* 193 B.R. 233, 244 (Bankr. S.D. W.Va. 1996) (approving sale of coal producer that could not fund operations and was nearly out of cash needed to operate pumps that prevented mines from flooding*); In re WBQ P'ship*, 189 B.R. 97, 102-03 (Bankr. E.D. Va. 1995) (approving sale of nursing homes as necessary to protect going concern value); *In re Weatherly Frozen Food Group, Inc.,* 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992) (approving sale of ice cream producer that lacked cash needed to perform maintenance necessary to continue operations); *In re Titusville Country Club,* 128 B.R. 396, 400 (Bankr. W.D. Pa. 1991) (approving sale of golf course at start of golf season where debtor had inadequate funds to maintain course for the season); *In re Channel One Comm., Inc.,* 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) (approving sale of radio station because of lack of funds needed to continue to operate); *In re Naron & Wagner, Chartered*, 88 B.R. at 90 (Bankr. D. Md. 1988) (approving sale of computer business where debtor was unable to continue operations due to lack of liquidity); *In re Condere Corp.,* 228 B.R. 615, 629 (Bankr. S.D. Miss. 1998) (approving sale of tire plant that needed major capital infusion to reach necessary production levels); *In re Boogaart of Fla., Inc.,* 17 B.R. 480, 483 (Bankr. S.D. Fla. 1981) (approving liquidation of grocer operating at a continual loss).

60.     Bankruptcy Code section 363(m) thus protects the purchaser of assets sold pursuant to Bankruptcy Code section 363 from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.  By its terms, Bankruptcy Code section 363(m) applies to sales of interests in tangible and intangible assets, such as the Acquired Assets.

61.     The Debtors submit, as stated in the Stengel Declaration and as will be supplemented by, and will present evidence at the Sale Hearing, if necessary, the Agreement was an intensely negotiated and represents arm's-length negotiation between the parties, in which the Stalking Horse Purchaser acted in good faith.  There has been no collusion with the Stalking Horse Purchaser. Debtors and the Stalking Horse Purchaser had separate legal counsel and advisors to help negotiate the transaction.  The Debtors' financial advisor in the transaction, CDG, was an independent investment broker and financial advisor retained to assist the Debtors to explore their strategic alternatives, market their business and assets and negotiate transactions including the disposition of the Assets.  Debtors' counsel bankruptcy counsel is very experienced in negotiating sale transactions in bankruptcy cases.  Moreover, the transaction was unanimously approved and authorized by the Debtors board of directors, with a majority of the board being comprised of independent directors.  The Debtors request that the Court make a finding and ruling that the Stalking Horse Purchaser has purchased the Acquired Assets in good faith and is entitled to the protection offered by Bankruptcy Code section 363(m).

### L.     The Sale Satisfies the Requirements of Bankruptcy Code section 363(f)

62.     Under Bankruptcy Code section 363(f), a debtor in possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien,

claim or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a bona fide dispute; or (v) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f); *Citicorp Homeowners Serv., Inc.* v. *Elliot (In re Elliot),* 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that Bankruptcy Code section 363(f) is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met). Because the Debtors expect that they will satisfy, at minimum, the second and fifth of these requirements, if not others as well, approving the sale of the Acquired Assets free and clear of all adverse interests is warranted. Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically identified in section 363(f). *See, e.g., In re Trans World Airlines, Inc.,* 2001 WL 1820325 at *3, 6 (Bankr, D. Del. March 27, 2001); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.),* 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

63.　　Included in the scope of the section 363 sale relief requested herein, the Debtors seek to sell their assets free and clear of any claims and interests relating to or arising under any labor agreements or employment agreements, including, but not limited to, those claims and interests that may be asserted by any parties to any of the collective bargaining agreements where the Debtors are parties. The sale of the Debtors' assets will be dramatically hindered and impaired, and the Debtors' creditors and other interested parties (including the employees and their labor union representatives themselves) will be harmed as a result, unless buyers can purchase the assets free and clear of these kinds of claims and interests. Prospective purchasers will necessarily be more interested in buying the assets on a going concern basis if they are

assured that they will not be saddled with legacy liabilities and may bargain a new agreement suited to their needs. Sales pursuant to section 363 are routinely approved by other courts free and clear of labor and employment and collective bargaining agreements with those claims and interests, if any, attaching to the proceeds generated by the asset sales in whatever priority the law provides. This is exactly the relief the Debtors seek as part of this 363 motion. *See, e.g., In re General Motors Corp.* 407 B.R. 463, 509-511 (Bankr. S.D.N.Y. 2009); *In re Family Snacks, Inc.*, 257 BR 884 (B.A.P. 8th Cir. 2001); *In re The Lady H Coal Company, Inc.* 193 B.R. 233 (Bankr. S.D.W.V. 1996); *In re Maxwell Newspapers, Inc.*, 981 F.2d 85 (2d Cir. 1992).

### M. The Bid Protections to the Stalking Horse are Reasonable and Appropriate

64. Approval of the requested Breakup Fee to the Stalking Horse Purchaser is governed by standards for determining the appropriateness of bidding incentives in the bankruptcy context established by the Third Circuit in *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),* 181 F.3d 527 (3d Cir. 1999) (hereinafter *In re O'Brien*). In *In re O'Brien,* the Third Circuit concluded that "the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence. In other words, the allowability of break-up fees . . . depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *In re O'Brien,* 181 F.3d at 535. Here, the Breakup Fee should be approved because they will provide a benefit to the Debtors' estates.

65. Included in the scope of the section 363 sale relief requested herein, the Debtors seek to sell their assets free and clear of any claims and interests relating to or arising under any labor and employment agreements, including those claims and interests that may be asserted by any parties to any of the collective bargaining agreements where the Debtors are parties. The

sale of the Debtors' assets will be dramatically hindered and impaired unless buyers can purchase the assets free and clear of these kinds of claims and interests. Sales pursuant to section 363 have been approved by other courts free and clear of labor and employment and collective bargaining agreements with those claims and interests, if any, attaching to the proceeds generated by the asset sales in whatever priority the law provides. This is exactly the relief the Debtors include as part of this 363 motion. See *In re General Motors Corp.* 407 B.R. 463, 509-511 (S.D.N.Y. 2009); *In re Family Snacks, Inc.*, 257 BR 884 (B.A.P. 8th Cir. 2001); *In re The Lady H Coal Company*, *Inc.* 193 B.R. 233 (S.D.W.V. 1996); *In re Maxwell Newspapers, Inc.*, 981 F.2d 85 (2d Cir. 1992).

66.     In *In re O'Brien,* the Third Circuit referred to nine factors that the bankruptcy court viewed as relevant in deciding whether to award a break-up fee: (1) the presence of self-dealing or manipulation in negotiating the break-up fee; (2) whether the fee harms, rather than encourages, bidding; (3) the reasonableness of the break-up fee relative to the purchase price; (4) whether the "unsuccessful bidder place[d] the estate property in a sales configuration mode to attract other bidders to the auction"; (5) the ability of the request for a break-up fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders"; (6) the correlation of the fee to a maximization of value of the debtor's estate; (7) the support of the principal secured creditors and creditors committees of break-up fee; (8) the benefits of the safeguards to the debtor's estate; and (9) the "substantial adverse impact [of the break-up fee] on unsecured creditors, where such creditors are in opposition to the break-up fee." *See In re O'Brien,* 181 F.3d at 536.

67.     The Third Circuit identified at least two instances in which bidding incentives may benefit the estate. First, expense reimbursement may be necessary to preserve the value of

the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id* at 537. Second, if the availability of an expense reimbursement were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. *Id.*

68.     After considering the reasonableness of bidding incentives, courts have approved a range of break-up fees as a percentage of the purchase price as being appropriate under the facts and circumstances of the case. *See In re Chi-Chi's Inc.,* Case No. 03-13063 (Bankr. D. Del. November 4, 2003) (fee of 5.1% permitted); *In re Riverstone Networks,* Case No. 06-10110 (Bankr. D. Del. February 24, 2006) (fee of 3% permitted); *In re Radnor Holdings,* Case No. 0610894 (Bankr. D. Del. September 22, 2006) (aggregate fee and expense reimbursement of 3% permitted); *Tama Beef Packing, Inc.,* 312 B.R. 192 (Bankr. N.D. Iowa 2004) (court noted that typical break-up fees are calculated at 3 to 4% of purchase price and upheld fee of 3.2%); *In re Great Northern Paper, Inc.,* Case No. 03-10048 (Bankr. D. Me. February 18, 2003) (fee of 5.4% plus reimbursement of expenses upheld); *Integrated Resources,* 147 B.R. 650, 662 (S.D.N.Y. 1992) (break-up fee representing up to 3.2% of bidder's out-of-pocket expenses or 1.6% of the proposed purchase price; expert testified that outside of bankruptcy break-up fees average 3.3%).

69.     Whether evaluated under the "business judgment rule" applied by many courts or the Third Circuit's "administrative expense" standard, the requested Breakup Fee should be approved because they are necessary to obtain the maximum return for the benefit of the Debtors' estates. All negotiations between the Debtors and the Stalking Horse Purchaser have been conducted in good faith, and at arm's-length basis. The Debtors' ability to continue to shop

the Acquired Assets for a higher or better offer without risk of losing the Stalking Horse Purchaser, a "bird-in-the-hand", would be eliminated if the Debtors are not authorized to remit the Breakup Fee. Therefore, absent authorization of the payment of the Breakup Fee, the Debtors might lose the opportunity to obtain the highest and best available offer for the Acquired Assets and the downside protection that will be afforded by the Agreement.

70.     Payment of the Breakup Fee is not likely to diminish the Debtors' estates, rather the Agreement and the Stalking Horse Purchaser's offer will form the basis upon which other bids will be submitted and evaluated. The approval of the Breakup Fee permits the Debtors to insist that competing bids for the Acquired Assets be higher or otherwise better than the purchase price under the Agreement, which is a clear benefit to the Debtors' estates. Thus, even if the Stalking Horse Purchaser is offered the Breakup Fee and is ultimately not the Successful Bidder, the Debtors will still have benefited from the higher floor established by improved bids and thereby increase the likelihood that the price at which the Acquired Assets are sold reflects their true worth.

71.     Given the exigencies of the Debtors' financial condition and the current state of the national credit markets, the Breakup Fee is not only necessary, but reasonable. Paying a Breakup Fee is reasonable since the Stalking Horse's bid provides benefits to the Debtors' estates that will be realized by having a signed purchase agreement, enabling the Debtors to preserve the value of their estates and promote more competitive bidding, ample support exists for the approval of the Breakup Fee.

72.     The Debtors' payment of the Breakup Fee under the circumstances described herein would be (i) an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of Bankruptcy Code section 503(b); (ii) of substantial benefit to the Debtors'

estates; and (iii) reasonable and appropriate in light of the efforts and the significant due diligence costs and expenses that have been and will be expended by the Stalking Horse Purchaser. The Debtors have demonstrated sound business justification and legal for authorizing the requested Breakup Fee.

### N. The Cure Procedures Provide Adequate Notice and Opportunity to Object and Should be Approved

73. Bankruptcy Code section 365(a) provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g., In re Stable Mews Assoc., Inc.,* 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. *See Group of Institutional Investors* v. *Chicago, Milwaukee, St. Paul & Pacific R.R. Co.,* 318 U.S. 523 (1943); *Sharon Steel Corp.,* 872 F.2d 36, 39-40 (3d Cir. 1989). The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp.* v. *West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.),* 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *Stable Mews Assoc.,* 41 B.R. at 596). Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co.* v. *Capital Bank, NA.,* 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to Bankruptcy Code section 365(b)(1), for a debtor to assume an executory contract, it must "cure, or provide

adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

74.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract. *See In re Rickel Home Centers, Inc.,* 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also In re Headquarters Dodge, Inc.,* 13 F.3d 674,682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

75.     Bankruptcy Code section 365(f) provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc.* v. *Arrari (In re Carlisle Homes, Inc.),* 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.,* 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *Accord In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

76.     Additionally, Bankruptcy Code section 105(a) provides a bankruptcy court with broad powers in the administration of a case under title 11.  Section 105(a) provides that "[t]he

court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *See In re Fesco Plastics Corp.,* 996 F.2d 152, 154 (7th Cir. 1993); *Pincus* v. *Graduate Loan Ctr. (In re Pincus),* 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., In re Chinichian,* 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code"); *In re Cooper Props. Liquidating Trust, Inc., 61* B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of their creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

77.     The Debtors respectfully submit that the proposed Cure Procedures are appropriate and reasonably tailored to provide non-Debtor parties to Assignable Agreements with adequate notice, in the form of the Cure Notice, of the proposed assumption and/or assignment of their applicable contract or lease, as well as proposed cure amounts, if applicable. Such non-Debtor parties to the Assignable Agreements will then be given an opportunity to object to such notice. The Cure Procedures further provide that, in the event an objection is not resolved, the Court will determine related disputed issues (including any adequate assurance of future performance issues). Accordingly, the Debtors submit that legal and factual bases exist to support the proposed Court's opinion of the proposed Cure Procedures.

### O.  Relief from the Ten Day Stay Periods Under Bankruptcy Rule 6004(h) is Appropriate

78.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." The Debtors request that the Sale Order be effective immediately by providing that the ten (10) day stay under Bankruptcy Rule 6004(h) is waived.

79.     The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to FED. R. BANKR. P. 6004(h).  Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten (10) day stay period, the leading Bankruptcy treatise suggests that the ten (10) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY 15th Ed. Rev., ¶ 6004.10 at 6004-18 (L. King, 15th rev. ed. 2008). The treatise further provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  *Id.*

80.     As described above and in the Stengel Declaration, time is clearly of the essence. The troubled economic environment, coupled with particular vulnerabilities of the Debtors service intensive and long term customer relationship oriented business model, enhanced with the threat of liquidation means that the Debtors' assets and business are at significant risk of losing value if a prompt closing of the Sale cannot be accomplished.  A prompt closing of the Sale is therefore of critical importance and the Debtors request that the Court waive the ten-day stay period under Bankruptcy Rule 6004(h).

## VII.     <u>NO PRIOR REQUEST</u>

81.     No prior request for the relief sought in the Motion has been made to this Court or any other court.

## VIII.     <u>NOTICE</u>

82.     No Trustee or examiner has been appointed in the Debtor's chapter 11 case. Notice of the hearing on this Motion has been provided to the Office of the United States Trustee, the thirty (30) largest unsecured creditors, the Official Committee of Unsecured Creditors, all those parties requesting special notice under Bankruptcy Rule 2002, counsel or the Stalking Horse Purchaser and counsel to the Prepetition Lenders. The Debtor submits that under the circumstances, the notice provided is adequate and sufficient under the circumstances no further notice is necessary.

## IX.     <u>CONCLUSION</u>

WHEREFORE, The Penn Traffic Company respectfully requests: (i) entry of the proposed Bid Procedures Order, substantially in the form attached hereto as **Exhibit B**; (ii) entry of the proposed Sale Order, substantially in the form attached hereto as **Exhibit D**; and (iii) such other and further relief as the Court deems just and proper.

Dated: December 4, 2009    MORRIS, NICHOLS, ARSHT & TUNNELL LLP
   Wilmington, Delaware

By: */s/ Ann C. Cordo*_____
Eric D. Schwartz (Del. No. 3134)
Gregory W. Werkheiser (Del. No. 3553)
Ann C. Cordo (Del. No. 4817)
1201 North Market Street, 18th Floor
P.O. Box 1347
Wilmington, Delaware  19899-1347
Telephone: 302.658.9200
Facsimile: 302.658.3989
eschwartz@mnat.com
gwerkheiser@mnat.com
acordo@mnat.com

  -and-

HAYNES AND BOONE, LLP
Lenard M. Parkins (NY 4579124)
Michael E. Foreman (NY 2043248)
Abigail Ottmers (TX 24037225)
1221 Avenue of the Americas, 26th Floor
New York, NY 10020
Telephone: 212.659.7300
Facsimile:  212.918.8989
lenard.parkins@haynesboone.com
michael.foreman@haynesboone.com
abigail.ottmers@haynesboone.com

***Proposed Counsel for the Debtors and Debtors in Possession***