## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | § **Chapter 11** |
| | § |
| THE PENN TRAFFIC COMPANY, *ET AL.*[1] | § **Case No. 09-14078 (PJW)** |
| | § |
| Debtors. | § **Jointly Administered** |
| | § |
| | § Hearing Date: January 8, 2010 at 2:00 p.m. (PROPOSED) |
| | § Objection Deadline: January 8, 2010 at 2:00 p.m. (PROPOSED) |

---

## DEBTORS' EMERGENCY MOTION FOR ORDERS APPROVING A GLOBAL SALE TRANSACTION WITH TOPS MARKETS, LLC AND OTHER RELATED RELIEF

The Penn Traffic Company, Sunrise Properties, Inc., Pennway Express, Inc., Penny Curtiss Baking Company, Inc., Big M Supermarkets, Inc., Commander Foods Inc., P and C Food Markets Inc. of Vermont, P.T. Development, LLC, and P.T. Fayetteville/Utica, LLC (collectively, "Penn Traffic" or the "Debtors") as debtors in possession, file this emergency motion (the "Motion") pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 6004, 6006, 9014, and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## I.        PRELIMINARY STATEMENT

Penn Traffic has entered into an Asset Purchase Agreement (as defined below) providing for the sale of substantially all of Penn Traffic's assets to Tops Markets, LLC (including any affiliate, subsidiary or assignee) ("Tops" or the "Stalking Horse Bidder" or the "Agent"), subject to higher and better offers. Penn Traffic has also entered into an Agency Agreement authorizing the Agent to sell Merchandise (as defined below), and to conduct going out of business sales at

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: The Penn Traffic Company (6800), Sunrise Properties, Inc. (4868), Pennway Express, Inc. (0863), Penny Curtiss Baking Company, Inc. (6750), Big M Supermarkets, Inc. (8022), Commander Foods Inc. (8023), P and C Food Markets Inc. of Vermont (5531), P.T. Development, LLC (8594), and P.T. Fayetteville/Utica, LLC (8582). The mailing address for all Debtors is: P.O. Box 4737, Syracuse, NY 13221-4737.

all of Penn Traffic's stores. In addition, Penn Traffic has entered into an Interim Operating Agreement (as defined below) and a Transition Services Agreement (as defined below) with the Agent. Penn Traffic is requesting the entry of the following four orders:

**(1) the first order**, substantially in the form attached hereto as **Exhibit A** (the "Bid Procedures Order"), approving (i) the procedures soliciting bids (the "Bid Procedures"), substantially in the form attached hereto as **Exhibit B**, for the sale (the "Sale") of substantially all of the Debtors' assets (collectively, the "Acquired Assets"), (ii) certain break-up fee and related bid procedure provisions of that certain Asset Purchase Agreement dated as of January 7, 2010 (the "Asset Purchase Agreement") substantially in the form attached hereto as **Exhibit C** between Penn Traffic and Tops with respect to the Sale, (iii) the scheduling of a hearing (the "Sale Hearing") on the Sale and setting objection and bidding deadlines with respect to the Sale, (iv) the form and manner of notice of an auction for the Sale and Acquired Assets (the "Auction"), and (v) the establishment of procedures to determine cure amounts and deadlines for objections for certain executory contracts and leases to be assumed and assigned by the Debtors (the "Acquired Contracts").

**(2) the second order**, substantially in the form attached hereto as **Exhibit D** (the "Sale Order"), (i) authorizing the Sale of the Acquired Assets pursuant to the Asset Purchase Agreement and/or the highest and best bids resulting from the Auction free and clear of liens, claims, encumbrances, and interests, (ii) authorizing the assumption and sale of the Acquired Contracts; (iii) approving an Interim Operating Agreement dated as of January 7, 2010 (the "Interim Operating Agreement") substantially in the form annexed hereto as **Exhibit E** between Penn Traffic and Tops, whereby Tops will act as Penn Traffic's agent to operate certain of Penn Traffic's stores, pending Tops' decision to assume or reject the unexpired leases of the stores;

(iv) approving a Transition Services Agreement dated as of January 7, 2010 (the "Transition Services Agreement") substantially in the form annexed hereto as **Exhibit F** between Penn Traffic and Tops with respect to the services to be provided by Penn Traffic (the "Transition Services") to Tops for a period of time (the "Term") in order to facilitate the transfer of the Acquired Assets, according to the terms of the Asset Purchase Agreement; and (v) approving an agreement (the "C&S Agreement") substantially in the form annexed hereto as **Exhibit G** between the Debtors, C&S, and Tops providing for the provision of certain services and the manner by which certain assets, as well as leases and executory contracts between the Debtors and C&S, will be transferred to Tops, or retained by C&S, after the closing of the Asset Purchase Agreement.

**(3)  the third order**, substantially in the form attached hereto as **Exhibit H**, approving the procedures set forth in the Agency Agreement dated as of January 7, 2010 (the "Agency Agreement"), substantially in the form attached hereto as **Exhibit I** between Penn Traffic and Tops, whereby Tops will act as Penn Traffic's agent to (x) sell all goods and inventory (collectively, the "Merchandise") at all of Penn Traffic's stores,[2] and (y) conduct going out of business sales at all of Penn Traffic's stores.

**(4) the fourth order**, substantially in the form attached hereto as **Exhibit J** (i) approving compromises and settlements of claims between Penn Traffic and (a) C&S Wholesale Grocers, Inc. ("C&S") and (b) UFCW Local One Pension Fund and UFCW Local One Health Care Fund (collectively, the "UFCW Parties").

---

[2] As provided in the Agency Agreement, Tops may choose to employ an additional party to act as Tops' agent for the purposes of liquidating the Merchandise.

## II.      JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.      BACKGROUND

### A.      General

2.      On November 18, 2009 (the "Petition Date"), the Debtors commenced their reorganization cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

3.      The Debtors are continuing in possession of their assets and are operating their businesses, as debtors in possession, pursuant to Bankruptcy Code sections 1107 and 1108.

4.      On the Petition Date, Penn Traffic filed the Declaration of Ronald F. Stengel, in Support of First Day Relief (the "Stengel Declaration"), which is incorporated herein by reference and shall constitute in part, the evidentiary support for the Motion.

5.      On December 2, 2009, the United States Trustee (the "Trustee") provided notice of the appointment of the Official Committee of Unsecured Creditors (the "Committee").

6.      On November 19, on the motion of the Debtors, the Court entered the Interim Order Pursuant to Bankruptcy Code sections 105, 361, 362, 363 and 364 (A) Authorizing the Debtors' Use of Cash Collateral by Consent, (B) Authorizing Postpetition Letter of Credit Financing, (C) Granting Adequate Protection and (D) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 (DI 54, the "First Interim Cash Collateral Order").  On November 30, 2009, the Court entered an amended First Interim Cash Collateral Order (DI 102).  On December 8, 2009, the Court entered a Second Interim Cash Collateral Order (DI 156).  On December 22, 2009, the Court entered a Third Interim Cash Collateral Order (DI 235, collectively with the First

Interim Cash Collateral Order, and the Second Interim Cash Collateral Order, as amended, the "Cash Collateral Order").

**B.      The Prepetition and Postpetition Marketing Process of the Debtors' Assets**

7.      Prior to the Petition Date, the Debtors, acting through their advisors and with the approval of the board of directors, implemented a marketing and sale process for the assets of the company designed to reach the strategic and financial buyers most likely to have an interest in the Debtors' assets and business.  Prior to the Petition Date, the Debtors and their advisors also devoted substantial resources and energy to examining ways in which to restructure leases and other obligations to enhance the viability of business going forward and to enhance the likelihood of a robust sale process.

8.      Prior to the Petition Date, and continuing thereafter the Debtors, with the assistance of financial advisors, Conway, Del Genio Gries & Co., LLC ("CDG"), contacted various parties interested in submitting both going concern and liquidation bids.  The Debtors executed non-disclosure agreements with various parties and provided the parties with access to an online data room which had been set up for due diligence purposes.  These efforts led to the Debtors filing certain motions, which the Debtors believed, at the time, represented the best method for selling certain of the Debtors' assets.

**C.      The Transactions with Tops and the Previous Sale Motions**

9.      As set forth in more detail in this Motion, the Debtors have determined, in the exercise of their business judgment, that the sale transactions with Tops represents the best opportunity for the Debtors' to maximize recovery to their creditors.  As such, if the Court approves the orders sought in this Motion, the Debtors will not seek to close any of the other sale transactions sought in motions previously filed by the Debtors in these cases.

## IV. RELIEF REQUESTED AND APPLICABLE AUTHORITY

10. By this Motion, the Debtors seek the entry of four orders of this Court: **(1) the first order**, a Bid Procedures Order (a) approving the Sale and Bid Procedures, Asset Purchase Agreement relating to the sale of the Acquired Assets and (b) approving the Break-Up Fee to the Stalking Horse Bidder, with respect to the Sale of the Acquired Assets, (c) scheduling the Sale Hearing and setting objection and bidding deadlines with respect to the Sale, (d) approving the form and manner of notice of Sale by Auction, and (e) establishing procedures to determine cure amounts and deadlines for objections for the Acquired Contracts; **(2) the second order**, a Sale Order (a) authorizing the Sale of the Acquired Assets free and clear of liens, claims, encumbrances, and interests pursuant to the Asset Purchase Agreement and (b) authorizing the assumption and sale of the Acquired Contracts; (c) approving the Interim Operating Agreement authorizing Tops to act as the Debtors' agent to operate the Debtors' stores pending the Agent's decision to assume or reject unexpired leases of the stores; (d) approving the Transition Services Agreement setting forth the services that the Debtors will provide Tops during the Term of the Transition Services Agreement in order to facilitate the transfer of the Acquired Assets, according to the terms of the Asset Purchase Agreement; and (e) approving the C&S Agreement providing certain services and the manner in which certain assets, executory contracts and leases will be transferred to Tops or retained by C&S; **(3) the third order**, an order approving the Agency Agreement authorizing Tops to act as the Debtors' agent to (a) sell the Merchandise at all of the Debtors' stores, and (b) conduct going out of business sales at all of the Debtors' stores; **(4) the fourth order**, an order (a) approving compromises and settlements of claims between the Debtors and (i) C&S and (ii) the UFCW Parties.

# V. THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS

11.     Pursuant to the Asset Purchase Agreement, the Debtors seek to sell the Acquired Assets to the Stalking Horse Bidder, subject to higher and better offers, free and clear of liens, claims, encumbrances and interests, including, without limitation, all claims arising under or related to labor, employment and collective bargaining agreements and pension agreements, with such liens, claims, encumbrances and interests to attach to the sale proceeds.  Ultimately the resulting sale proceeds from the highest and best offer or offers at the conclusion of the Auction will be distributed to creditors and interest holders.

12.     The Asset Purchase Agreement represents the culmination of an extensive negotiation process conducted by the Debtor and their advisors and the Stalking Horse Bidder and its advisors conducted in good faith and at arms' length.

## A.     Key Provisions of the Asset Purchase Agreement

13.     The following paragraphs in this section summarize key provisions of the Asset Purchase Agreement, but are qualified in their entirety by reference to the Asset Purchase Agreement.[3]

> (a)     Acquired Assets.  "Acquired Assets" shall mean all the Assets of the Debtors (referred to in the Asset Purchaser Agreement as "Seller"), including, as set forth in more detail in the Asset Purchase Agreement, Owned Machinery and Equipment, certain executory contracts and unexpired leases (the "Acquired Contracts"), certain real property, documents, Pharmacy Records, Inventory, Intellectual Property, phone numbers, Permits, deposits, intangibles, insurance polices, goodwill, warranties, representations and guarantees made to the Seller, data and records, the right, which right may be exercised at any time and from time

---

[3]   Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement, attached hereto as **Exhibit C**, or the Bid Procedures attached hereto as **Exhibit B**, as applicable.   The description of the Asset Purchase Agreement and the Bid Procedures contained in this  Motion are for informational purposes only, and in the event of any inconsistency between this description and the terms of the Agency Agreement or the Bid Procedures, the Agency Agreement and the Bid Procedures, as applicable, will control.

to time in Tops' (referred to in the Asset Purchase Agreement as "<u>Buyer</u>") sole and absolute discretion, to provide notice to Seller (each such notice, a "<u>Lease Assumption Notice</u>") of Buyer's election to require Seller, under section 365 of the Bankruptcy Code, to assume and assign to a third party (including, without limitation, Buyer) designated by Buyer (each a "<u>Leased Property Designee</u>") any or all of the Acquired Contracts, and the DuBois Assets.

(b)    <u>Consumer Privacy</u>.  The Acquired Assets shall not include (i) personnel files for former employees of Seller, (ii) such files as may be required under applicable law regarding privacy, (iii) documents which Seller is not permitted to transfer pursuant to any contractual confidentiality obligation owed to any third party, and (iv) any documents primarily related to any Excluded Assets; <u>provided</u>, <u>however</u>, if Buyer determines in its sole discretion to purchase documents subject to applicable law regarding privacy related to Seller's business, all costs of a privacy ombudsman to the extent that the Bankruptcy Court requires a privacy ombudsman to be appointed shall be paid for by Buyer;  <u>provided</u>, <u>however</u>, that no decision to commence an ombudsman process shall be made if that decision should delay closing after January 28, 2010.

(c)    <u>Excluded Assets</u>.  (a) all Cash; (b) the assets listed on Schedule 1.2(b) of the Asset Purchase Agreement; (c) all deposits relating to Excluded Assets or created after the Petition Date; (d) all documents primarily related to the Excluded Assets; (e) all Accounts Receivable, (f) all causes of action including, without limitation, causes of action pursuant to chapter 5 of the Bankruptcy Code of the Seller; and (g) all of Seller's right, title and interest in and to any contracts to which it is a party, other than the Acquired Contracts, including, without limitation, the Contracts set forth on Schedule 1.2(f) of the Asset Purchase Agreement (the "<u>Excluded Contracts</u>").

(d)    <u>Assumption of Liabilities</u>.  Except as provided in section 3.2(b)(viii) of the Asset Purchase Agreement, at the Closing, Seller shall pay all cure obligations ("<u>Cure Amounts</u>") and assume and assign to Buyer, and thereafter after the Closing, Buyer shall pay, perform and discharge, when due, all liabilities and obligations of Seller with respect to Acquired Assets first arising after the Closing Date, which liabilities and obligations are required to be paid by Buyer in accordance with section 365(k) of the Bankruptcy Code (the "<u>Assumed Liabilities</u>"), provided however, that additional rent items, such as percentage rents, common area maintenance charges, prorated taxes or other charges for which Seller may be liable to any landlord up to the Closing Date are the responsibility of Seller.

(e)    <u>Retention of Liabilities</u>.  Buyer is assuming only the Assumed Liabilities and is not assuming any other liability or obligation of Seller of whatever

nature, whether presently in existence or arising hereafter, including without limitation any Claims asserted or unasserted, known or unknown for injuries to persons or property which are related to circumstances or events that predate the Closing of the transaction contemplated hereunder. All such other liabilities and obligations shall be retained by and remain liabilities and obligations of Seller (all such liabilities are, collectively, the "Excluded Liabilities").

(f)     Purchase Price.   The aggregate consideration for the sale, transfer, assignment and conveyance of the Acquired Assets will be (a) $85,000,000 in cash (the "Purchase Price"), (b) the assumption by Buyer of the Assumed Liabilities, (c) the reduction of certain claims asserted by C&S Wholesale Grocers, Inc. ("C&S") as set forth in the Agreement, dated as of January 7, 2010, between Buyer and C&S (the "C&S Agreement") and (d) the reduction of certain claims asserted by the United Food and Commercial Workers, Local One (the "UFCW") and the UFCW Local One Pension Fund (the "Plan"), as set forth in the Memorandum of Agreement, dated as of January 5, 2010, among the Buyer, the UFCW and the Plan, and the Memorandum of Agreement, dated as of January 5, 2010, and the stipulation dated as of December 29, 2009 (the "UFCW Plan Stipulation"), among Buyer, Seller, the UFCW and the Plan (collectively, the "Total Consideration"). The Purchase Price shall be payable in accordance with Section 2.3 and Section 3.3(a) of the Asset Purchase Agreement.     Notwithstanding the foregoing, nothing in the Asset Purchaser Agreement shall limit Seller's ability to assert or file any objection to the validity or amount of the claims of C&S, the UFCW and/or the Plan.

(g)     Deposit.  Buyer shall deliver an earnest money deposit of $12,500,000 (the "Buyer's Deposit"), unless a different sum is required by order of the Bankruptcy Court, to a third party escrow agent (the "Escrow Agent") to be agreed upon by Buyer and Seller within three Business Days of the entry of the Bidding Procedures Order.  The Buyer's Deposit shall be held in escrow in an interest bearing account, with accrued interest added to the Buyer's Deposit, in accordance with the terms of the Bidding Procedures Order.

(h)     Closing.  The consummation of the transactions contemplated hereby (the "Closing") shall take place on the first Business Day following the satisfaction or waiver by the appropriate party of all the conditions contained in Article 7 of the Asset Purchase  Agreement or on such other date or at such other place and time as may be mutually agreed to by the parties (the "Closing Date"); provided, however, that in no event shall the Closing Date be later than January 28, 2010 in the event that prior to or by that date Seller is prepared to perform pursuant to Section 3.2 of the Asset Purchase Agreement and all conditions to Closing in Section 7.2 of the

Asset Purchase Agreement have been satisfied. All proceedings to be taken and all documents to be executed and delivered by the parties at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered. At Closing, Buyer shall deliver to the Escrow Agent a portion of the Purchase Price in an amount equal to $5,000,000 (the "Escrow Amount"). The Escrow Amount shall be held in escrow in an interest bearing account, with accrued interest added to the Escrow amount and shall be released as provided in Section 2.3 of the Asset Purchase Agreement. The Escrow Amount shall be the sole source of funds available for any reduction to the Purchase Price pursuant to the terms and conditions set forth in the Asset Purchase Agreement.

(i)     Termination. The Asset Purchase Agreement may be terminated only in accordance with Section 8.1 of the Asset Purchase Agreement.

(j)     Break-Up Fee. If the Asset Purchase Agreement is terminated pursuant to Section 8.1(g) of the Asset Purchase Agreement, then, (i) within two Business Days after such termination, Seller shall return the Buyer's Deposit to Buyer and (ii) if Seller consummates an Alternative Transaction within 30 days after such termination, Seller also shall pay to Buyer a break-up fee equal to 3% of the cash portion of the Purchase Price (the "Break-Up Fee"), upon the closing of such Alternative Transaction, provided however, that pending payment of the Break-Up Fee Buyer shall be deemed to have an allowed administrative expenses claim for such amounts pursuant to sections 503(a) and (b) and 507(a)(2) of the Bankruptcy Code.

14.     As set forth in more detail in the Stengel Declaration, the Debtors owe certain Prepetition Secured Obligations to the First Lien Secured Lenders and the Second Lien Secured Lenders (collectively, the "Prepetition Secured Lenders"), as those terms are defined in the Stengel Declaration. The Purchase Price funds shall be used by the Debtors to satisfy, in full, the claims of the Debtors' Prepetition Secured Lenders in the following order: (i) the First Lien Secured Lenders; (ii) the Second Lien Secured Lenders.

**B.     The Proposed Bidding Procedures**

15.     The Debtors desire to receive the greatest value for the Acquired Assets. Although the Debtors and their professionals have undertaken prepetition and postpetition efforts

to market the Acquired Assets, in order to reach a broader pool of possible purchasers and to seize on possible sale opportunities before any devaluation of the Acquired Assets, the Debtors believe that it is imperative that they promptly move forward with an auction process in the hope that higher and better offers are generated for the Acquired Assets. Accordingly, the Bid Procedures (as summarized below) were developed consistent with the Debtors' need to expedite the sale process, and with the objective of promoting further active bidding that will result in the highest or best offer the marketplace can generate for the Acquired Assets while affording appropriate protection to the Stalking Horse Bidder. Moreover, the Bid Procedures reflect the Debtors' objective of conducting the Auction in a controlled, fair, and open process that promotes interest in the Acquired Assets by financially-capable, motivated bidders who are likely to close a transaction.

16. The Bid Procedures are typical for asset sales of this size and nature, and include provisions for consultation with the Committee and secured lenders, a deposit requirement, a break-up fee to the Stalking Horse Bidder and a requirement that a bidder be a "Qualified Potential Bidder" as defined in the Bid Procedures.

17. Pursuant to Rule 6004-1 Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"),[4] the following is a summary of certain key provisions of the proposed Bid Procedures.[5]

---

[4]   Local Rule 6004-1(c) requires the Bid Procedures Order to: (i) specify the date, time, and place of the Auction and then method for providing notice of any changes thereto; (ii) each bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale; (iii) the Auction will be conducted openly and all creditors will be permitted to attend provided that advance written notice is given to the Notice Parties; and (iv) the Auction will be transcribed or videotaped.

[5]   The description of the Bid Procedures contained in this Motion is for informational purposes only, and in the event of any inconsistency between this description and the terms of the Bid Procedures, the Bid Procedures shall control.

(a)    Participation Requirements.

Confidentiality Agreement. An executed confidentiality agreement in form and substance reasonably acceptable to the Debtors and the Committee (each a "Confidentiality Agreement"), in conformance with the form of confidentiality agreement heretofore used by the Debtors; and

Proof of Financial Ability to Perform. The most current audited and latest unaudited financial statements (collectively, the "Financials") of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of the Proposed Sale, Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure evidencing the Potential Bidder's financial wherewithal and any required authorizations to close the Sale including any entities that will guarantee the obligations o the Potential Bidder, the sufficiency of which shall be determined by the Debtors, in consultation with the First Lien Agent, in their reasonable discretion.

(b)    Qualified Bid.[6]

Identification of Qualified Potential Bidder. The identity of the Qualified Potential Bidder and the officer(s) or authorized agent(s) who will appear on behalf of such bidder.

Modified Asset Purchase Agreement. A Bid shall include an executed copy of a purchase agreement to acquire the Acquired Assets, together with a black-lined copy of the Asset Purchase Agreement (the "Modified Asset Purchase Agreement") to show all changes requested by the Qualified Potential Bidder, including those related to the Purchase Price; provided, however, that the terms of the Modified Asset Purchase Agreement are at least as good or better than the terms of the Asset Purchase Agreement.

Acquired Assets. Each Bid shall be for all of the Acquired Assets; provided, however, that the Debtors may consider a combination of multiple Bids, each of which is for less than all of the Acquired Assets, so long as (i) such combination of Bids collectively offers an aggregate amount equal to the Minimum Initial Bid (defined below), and (ii) each Bid comprising such combination otherwise meets the requirements of a Qualified Bid (such combination of Bids, a "Combination Bid").

---

[6] The Stalking Horse Bidder shall be deemed a Qualified Bidder at any auction.

Contingencies and Conditions. A Bid or Combination Bid may not be conditioned on obtaining internal approval or on the outcome or review of due diligence, but may be subject to verifying the accuracy in all material respects at the closing of specified representations and warranties or the satisfaction in all material respects at the closing of specified conditions, none of which shall be more burdensome than those set forth in the Asset Purchase Agreement. There shall not be any due diligence or financing contingencies.

Authorization to Bid. A Bid shall include evidence of authorization and approval from such Qualified Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified Asset Purchase Agreement.

Good Faith Deposit. Each Bid or Combination Bid must be accompanied by a cash deposit in an amount equal to 14.7% of the cash portion of the aggregate total consideration of such Bid or Combination Bid ("Good Faith Deposit"). The disposition of the Good Faith Deposit shall be in accordance with the terms of the Asset Purchase Agreement and order of the Bankruptcy Court. The Good Faith Deposit of the Successful Bidder shall be applied to the Purchase Price of such transaction at Closing. The Good Faith Deposits of all other Qualified Bidders shall be held in an interest-bearing escrow account until the Termination Date, and thereafter returned to the respective bidders. If a Successful Bidder fails to consummate an approved sale because of a breach or a failure to perform on the part of such Successful Bidder, the Debtors shall be entitled to retain the Good Faith Deposit as part of their damages resulting from the breach or failure to perform by the Successful Bidder. Recourse of the Debtors is not limited to the event of breach by the Successful Bidder.

Minimum Initial Bid Requirement. Each Qualified Bidder's Bid or Combination Bid shall have an initial minimum bid requirement equal to the sum of (i) the Total Consideration (which shall include a value determined by Debtors in their reasonable discretion in respect of clauses (b), (c) and (d) of the definition thereof), (ii) the Break-Up Fee, which must be paid in cash, and (iii) $1,000,000 (the "Minimum Initial Bid"). All subsequent bids shall be made in increments of $250,000.

Other Evidence to Support Closing a Sale. Each Bid or Combination Bid must contain evidence satisfactory to the Debtors, in consultation with the First Lien Agent that the bidder is reasonably likely (based on availability of financing, experience

and other considerations) to be able to timely consummate a purchase of the Acquired Assets if selected as the Successful Bidder (as defined below).

(c) <u>Bid Deadline</u>. The deadline for submitting bids by a Qualified Bidder shall be **<u>January 19, 2010, at 12:00 p.m. (prevailing Eastern Time)</u>** (the "<u>Bid Deadline</u>"). A Bid received after the Bid Deadline shall not constitute a Qualified Bid (as defined below).

(d) <u>Auction</u>. In the event that the Debtors receive at least one (1) Qualified Bid (other than from the Stalking Horse Bidder) by the Bid Deadline, the Debtors shall conduct an auction (the "<u>Auction</u>") of the Acquired Assets to determine the highest and otherwise best bid with respect to the Acquired Assets. No later than January 20, 2010 at 4:00 p.m. (prevailing Eastern time), the Debtors will notify all Qualified Bidders of (i) the highest or otherwise best Qualified Bid, (the "<u>Baseline Bid</u>") and (ii) the time and place of the Auction. The Auction shall commence at 9:00 a.m., (prevailing Eastern time) on January 21, 2010 at the offices of Morris, Nichols, Arsht & Tunnell, LLP, 1201 N. Market St., 18th Floor, Wilmington, DE 19801.

(e) <u>Sale Hearing</u>. The Sale Hearing shall be conducted by the Bankruptcy Court on or before January 25, 2010.

(f) <u>Closing with Alternate Bidder; Forfeiture of Good Faith Deposit</u>. In the event the Successful Bidder fails to consummate the sale as a result of the Successful Bidder's default or breach under the applicable purchase agreement in accordance with the terms of such purchase agreement by the closing date contemplated in such purchase agreement, the Debtors shall: (i) retain the Successful Bidder's Good Faith Deposit as part of the damages for breach by the Successful Bidder and without any limitation of Debtors' recourse for a breach by the Successful Bidder; and (ii) in consultation with the Committee and the First Lien Agent, be free, but not obligated to enter into a new purchase agreement with the next most appropriate Qualified Bidder (the "<u>Alternate Qualified Bidder</u>") at the highest price or otherwise best bid by such Qualified Bidder at the Auction. Such Alternate Qualified Bidder shall thereafter be bound to execute a new purchase agreement with the Debtors which was included as part of his Qualified Bid and the Alternate Bidder shall then be the Successful Bidder and must comply with all other requirements of the Successful Bidder hereunder.

18. The Debtors expressly reserve the right to modify the Bid Procedures with the consent of the First Lien Agent, whether for competing bids for Stalking Horse Bidder or going concern bids. Moreover, the Debtors, reserve the right, upon notice to all Notice Parties and

those parties that have demonstrated an interest in bidding on the Acquired Assets, to, with the consent of the First Lien Agent: (a) waive terms and conditions set forth herein with respect to any or all potential bidders; (b) impose additional terms and conditions with respect to any or all potential bidders; (c) extend the deadlines set forth herein; (d) cancel the sale of the Acquired Assets and/or Sale Hearing in open court without further notice; and (e) amend the Bid Procedures as they may determine to be in the best interests of their estates or to withdraw the Motion at any time with or without prejudice.

C.      **Proposed Stalking Horse Bidding Protections**

19.     As part of the Bid Procedures, the Debtors are seeking approval of the provisions of the Asset purchase agreement regarding the payment of a break up fee in the amount of 3% of the cash portion of the Purchase Price for the Acquired Assets (the "Break-Up Fee"), which is paid to the Stalking Horse Bidder in accordance with the Asset Purchase Agreement if the Asset Purchase Agreement is not consummated because the Debtors elect to sell the Acquired Assets to a Successful Bidder other than the Stalking Horse Bidder.  The Debtors believe that the payment of the Break-Up Fee is reasonable, necessary and appropriate to induce the Stalking Horse Bidder to enter into the Asset Purchase Agreement, which will serve as a floor price for the Acquired Assets against which other offers may be judged.  Further, the Break-Up Fee is reasonable and is consistent with the size of break-up fees in transactions like this one.  Most important, the Break-Up Fee is meant to protect the value of the estate by allowing a robust auction, while also providing a guaranteed minimum amount that the estate will receive in respect of the Acquired Assets.

D.      **Notice of Auction and Sale Hearing**

20.     The Debtors seek to have the Auction scheduled for January 21, 2010 as set out in the Asset Purchase Agreement. The timing of the Auction is consistent with milestones

embodied in the Cash Collateral Order, which remains effective in this case. The Debtors request that the Sale Hearing be held on January 25, 2010. In addition to being required by the terms of the Asset Purchase Agreement and the Cash Collateral Order, early Auction and Sale hearing dates are imperative because the value of the Acquired Assets will decline substantially if the sale process is not completed quickly, as customers, employees and key vendors will terminate their relationships with the Debtors. Further, if use of cash collateral stops before the Auction is completed, the going concern portion of the sale will not be possible. The nature of the Debtors' business and, particularly, their dependency on skilled employees and customer loyalty, make the value of the Debtors' business and assets especially vulnerable to erosion if they remain in chapter 11 any longer than is absolutely necessary to implement the Sale.

21.     Not later than one business day after the entry of the Bid Procedures Order, the Debtors will serve copies of the Sale Notice, substantially in the form attached hereto as **Exhibit K** (the "Sale Notice"), the Bid Procedures, and the Bid Procedures Order by mail, postage prepaid to: (a) all entities known to have expressed a *bona fide* interest in acquiring the Acquired Assets (by overnight mail); (b) counsel to the Debtors' prepetition lenders; (c) the Office of the United States Trustee for the District of Delaware; (d) known entities holding or asserting a security interest in or lien against any of the Acquired Assets; (e) taxing authorities whose rights may be affected by a sale of the Acquired Assets; (f) all government agencies required to receive notice of proceedings under the Bankruptcy Rules; (g) counsel for the Committee; (h) all labor unions through their bargaining representatives; (i) the Debtors' shareholders and equity security holders and (j) all parties that have requested notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of entry of the Bid Procedures Order.

22.     The Debtors further request, pursuant to Bankruptcy Rule 9014, that objections, if

any, to the proposed Sale: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the

District of Delaware (the "Local Rules"); (c) be filed with the Clerk of the United States

Bankruptcy Court for the District of Delaware, 824 Market Street, 3rd Floor, Wilmington,

Delaware 19801, by 4:00 p.m. (prevailing Eastern Time) on January 19, 2010 (the "Objection

Deadline"); and (d) be served so as to be received by the Objection Deadline by:

(i)     the Debtors, c/o The Penn Traffic Company, 1200 State Fair Blvd., Syracuse NY, 13221, Attn: Ronald F. Stengel, CRO;

(ii)    counsel to the Debtors, Haynes and Boone, LLP, 1221 Avenue of the Americas, 26th Floor, New York, NY 10020, Attn: Michael E. Foreman and Lenard M. Parkins, and Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market St., P.O. Box 1347, Wilmington, DE 19899-1347, Attn: Gregory W. Werkheiser , Esq.;

(iii)   counsel to Tops, Winston & Strawn LLP, 200 Park Avenue, New York, NY 10166, Attn: Dom DeChiara, Esq.;

(iv)    counsel to the First Lien Agent Paul, Hastings, Janofsky & Walker LLP, 75 E. 55th Street, New York, NY 10022, Attn: Leslie Plaskon, Esq., Jesse H. Austin, Esq., and Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801, Attn: Mark D. Collins, Esq.;

(v)     counsel to the Second Lien Agent Greenberg Traurig, LLP, One International Plaza Boston, MA 02110, Attn: Jeff M. Wolf, Esq., and Donald J. Detweiler;

(vi)    counsel to the Committee, Otterbourg, Steindler, Houston & Rosen, P.C., 230 Park Avenue, New York, NY, 10169-0075, Attn: Scott Hazan, Esq. and Jenette A. Barrow-Bosshart, Esq.; and

(vii)    the Office of the United States Trustee (the "U.S. Trustee"), 844 King Street, Suite 2207, Wilmington, DE 19801.

(the "Objection Service Parties").

**E.    Procedures to Determine Cure Amounts and Deadlines for Objection to Assumption and Assignment of the Acquired Contracts**

23.    To facilitate and effectuate the Sale, the Debtors will be required to assume and/or assign the Acquired Contracts to the Stalking Horse Bidder (or the Stalking Horse Bidder's designee), or as applicable, to the Alternate Successful Bidder.  The Debtors expect, and the Asset Purchase Agreement contemplates, that the Acquired Contracts will be a subset (as designated by the Stalking Horse Bidder or Alternate Successful Bidder) of the executory contracts and unexpired leases to which one or more of the Debtors is a party.

24.    Given the large number of Acquired Contracts, the Debtors seek to establish (a) procedures for determining cure amounts through the closing date of the Sale (the "Cure Amounts"); and (b) the deadline for objections to the potential assumption and/or assignment of the Acquired Contracts in connection with the Sale (collectively, the "Cure Procedures").

25.    On or prior to the date of entry of the Bid Procedures Order, or as soon thereafter as is practicable, the Debtors will file with the Court an initial list of Cure Amounts for the Acquired Contracts.  The Debtors reserve the right to supplement or modify the list of Cure Amounts for the Acquired Contracts at any time prior the commencement of the Sale Hearing.

26.    Additionally, the Debtors will prepare and distribute to non-Debtor parties to the Acquired Contracts a notice, substantially in the form annexed hereto as **Exhibit L** (the "Cure Notice"), listing: (a) the Acquired Contract(s); and (b) the Cure Amount(s), if any.  If the Stalking Horse Bidder is not the Successful Bidder at the Auction, no later than two (2) business days after the Auction, the Debtors shall send a subsequent Cure Notice, to all non-Debtor parties to executory contracts or unexpired leases to be assigned to the Successful Bidder that were not initially identified as an Acquired Contract.

27.     To facilitate a prompt resolution of cure disputes and objections relating to the assumption and assignment of the Acquired Contracts, the Debtors propose the following deadlines and procedures:

(a)     The non-Debtor parties to the Acquired Contracts shall have until 4:00 p.m. (prevailing Eastern Time) on January 20, 2010 (the "Acquired Contract Objection Deadline"), which deadline may be extended in the sole discretion of the Debtors, to object ("Acquired Contract Objection") to: (i) the Cure Amounts listed by the Debtors and to propose alternative cure amounts; and/or (ii) the proposed assumption and/or assignment of the Acquired Contracts in connection with the Sale; provided, however, if the Stalking Horse Bidder is not the Successful Bidder at the Auction, and the Debtors send a Cure Notice to a non-Debtor party to an Acquired Contract, or if the Debtors otherwise amend the Cure Notice to add a contract or lease or to reduce the Cure Amount thereof, except where such reduction was upon mutual agreement of the parties, the non-Debtor parties thereto shall have until the commencement of the Sale Hearing to submit an Acquired Contract Objection (the "Amended Acquired Contract Objection Deadline").

(b)     Any party objecting to the Cure Amounts or objecting to the potential assumption and/or assignment of such Acquired Contract(s), shall be required to file and serve an Acquired Contract Objection, in writing, setting forth with specificity any and all cure obligations that the objecting party asserts must be cured or satisfied in respect of the Acquired Contract(s), as applicable, and/or any and all objections to the potential assumption and/or assignment of such agreements, together with all documentation supporting such cure claim or objection, upon the Notice Parties, so that the Acquired Contract Objection is received no later than 4:00 p.m. on the Acquired Contract Objection Deadline or the Amended Acquired Contract Objection Deadline, as applicable. Where a nondebtor counterparty to an Acquired Contract files an objection asserting a cure amount higher than the proposed Cure Amounts (the "Disputed Cure Amount"), then (i) to the extent the parties are able to consensually resolve the Disputed Cure Amount prior to the Sale Hearing, and subject to the consent of the Stalking Horse Bidder (or the Successful Bidder) of such consensual resolution, the Debtors shall promptly provide the Committee and the Stalking Horse Bidder (or the Successful Bidder) notice and opportunity to object to such proposed resolution; or (ii) to the extent the parties are unable to consensually resolve the dispute prior to the Sale Hearing, then such objection will be heard at the Sale Hearing or thereafter.

(c)     In the event that the Debtors receive at least one (1) Qualified Bid (other than the Stalking Horse Bidder) by the Bid Deadline of January 19, 2010

at 12:00 p.m. (prevailing Eastern Time), the Debtors shall conduct the Auction on January 21, 2010 at 9:00 a.m. (prevailing Eastern Time). If, at the Auction, a Qualified Bidder other than the Stalking Horse Bidder is the Successful Bidder for the Acquired Assets, then the Successful Bidder shall provide parties to the Acquired Contracts evidence of adequate assurance of future performance as soon as practicable. Furthermore, in such an event, parties to the Acquired Contracts shall be entitled to file objections to the Successful Bidder's adequate assurances of future performance at any time prior to the Sale Hearing or may raise such objections at the Sale Hearing.

28.     Unless an objection to the assumption and assignment of an Acquired Contract is filed and served before the Acquired Contract Objection Deadline, all counterparties to the Acquired Contracts shall: (a) be forever barred from objecting to the proposed Cure Amounts and from asserting any additional cure or other amounts with respect to the Acquired Contracts, and the Debtors and Stalking Horse Bidder (or the Alternative Successful Bidder) shall be entitled to rely solely upon the proposed Cure Amounts set forth in the Cure Notices; (b) be deemed to have consented to the assumption and assignment;  and (c) be forever barred and estopped from asserting or claiming against the Debtors or Stalking Horse Bidder (or the Successful Bidder) that any additional amounts are due or other defaults exist, that conditions to assignment must be satisfied under such Acquired Contract or that there is any objection or defense to the assumption and assignment of such Acquired Contract to the Asset Purchase Agreement or consummation of the Sale.

29.     For the avoidance of doubt, no executory contract or unexpired lease will become an Acquired Contract that is assumed and assigned to the Stalking Horse Bidder or other Successful Bidder, as applicable, until such time as the Sale Order has been entered and the transaction contemplated by the Asset Purchase Agreement or other purchase agreement of the other Successful Bidder, as applicable, has been consummated.

**F. Provisions of the Asset Purchase Agreement that May Implicate Local Rule 6004-1(b)(iv)**

30.     Pursuant to Local Rule 6004-1(b)(iv), the Debtors are required to highlight certain provisions of this Motion relating to approval of the Sale and Bid Procedures, including:

      (a)    <u>Private Sale/No Competitive Bidding</u>.  If no Qualified Bids are received other than from the Stalking Horse Bidder, no Auction will occur and the Debtors will seek approval of the Sale.

      (b)    <u>Sale Free and Clear</u>. Unless otherwise agreed, the sale of the Acquired Assets shall be free and clear of all liens, claims, encumbrances and interests, including those arising under or related to labor, employment and collective bargaining agreements, pension, ERISA, tax or other agreements of the Debtors.

      (c)    <u>Good-Faith Deposit or Security and Conditions for Forfeiture</u>.  The Stalking Horse Bidder shall deliver an earnest money deposit of $12,500,000 (the "<u>Buyer's Deposit</u>").  Each other Bid must be accompanied by security or a deposit in the form of cash or a certified bank check in the amount of 14.7% of the Bid.  If the Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Bidder, the Debtors shall be entitled to retain the deposit as part of their damages resulting from the breach or failure to perform by such Bidder.

      (d)    <u>Use of Proceeds</u>.  The Purchase Price shall be distributed in the following order: (i) to satisfy amounts outstanding to the First Lien Secured Lenders, (ii) to satisfy amounts outstanding to the Second Lien Secured Lenders and (iii) other creditors of the Debtors.  All liens, claims, encumbrances and interests held by any creditor including the First Lien Secured Lenders and the Second Lien Secured Lenders shall attach only to the Purchase Price.

      (e)    <u>Relief from Bankruptcy Rule 6004(h)</u>.  The Debtors seek such relief with respect to the proposed Bid Procedures Order and the Sale Order to be negotiated by the parties.

## VI.     THE INTERIM OPERATING AGREEMENT

31.     Pursuant to the Interim Operating Agreement, the Debtors seek to appoint Tops as their agent to operate the Debtors' stores pending the Agent's decision to assume or reject the Acquired Contacts (as that term is defined in the Asset Purchase Agreement).

32.     The Interim Operating Agreement represents the culmination of an extensive

negotiation process conducted by the Debtor and their advisors and the Agent and its advisors.

**A.     Key Provisions of the Interim Operating Agreement**

33.     The following paragraphs in this section summarize key provisions of the Interim

Operating Agreement, but are qualified in their entirety by reference to the Interim Operating

Agreement.[7]

> (a)     Appointment of Agent.  By the Interim Operating Agreement, the Debtors (referred to in the Interim Operating Agreement as the "Merchant"), appoint Tops and Tops agrees to serve, as Merchant's exclusive agent for the limited purpose of operating the Stores on an interim basis in accordance with the terms and conditions of the Interim Operating Agreement.  Merchant's and Tops' obligations under the Interim Operating Agreement are subject to the approval of the Bankruptcy Court and shall be of no force and effect in the event that the Bankruptcy Sale Order (as defined in the Asset Purchase Agreement) is not entered.

> (b)     Payment to Agent.  Subject to entry of the Bankruptcy Sale Order, as its compensation for services rendered to Merchant, Tops shall be entitled to all Proceeds after payment of the Expenses and all other amounts payable to Merchant under the Interim Operating Agreement.

> (c)     Expenses.  Tops shall be responsible for all Expenses arising and incurred in operating the Stores on an interim basis during the Term, which Expenses shall be paid by Tops in accordance with Section 5  of the Interim Operating Agreement.

> (d)     Term.  Subject to entry of the Bankruptcy Sale Order, operating the Stores on an interim basis shall commence at the Stores at Closing (the "Interim Operating Agreement Commencement Date") and shall terminate 90 days following the Closing (the "Termination Date").  The period from the Interim Operating Agreement Commencement Date to the Termination Date shall be referred to in the Interim Operating Agreement as the "Term."  The Termination Date may be (a) extended by mutual written agreement of Tops and Merchant; or (b) accelerated by Tops, in which case Tops shall provide Merchant with not less than three (3) days' advance written notice of any such planned accelerated Termination Date.

---

[7] Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Agency Agreement, attached hereto as **Exhibit H**, as applicable.

(e)     <u>Conduct of Interim Operation of Stores</u>.  Subject to the Bankruptcy Sale Order, Tops shall be permitted to operate the Stores on an interim basis, and Tops, in the exercise of its reasonable discretion, shall have the right to take actions related to such operation, as set forth in the Interim Operating Agreement.

**B.     Provisions of the Interim Operating Agreement that May Implicate Local Rule 6004-1(b)(iv)**

34.     Pursuant to Local Rule 6004-1(b), the Debtors are required to highlight certain provisions of this Motion relating to approval of the Interim Operating Agreement, including:

(a)     <u>Agreements with Management</u>.  Tops shall use certain of the Debtors' employees during the Term (the "<u>Store Employees</u>").  The Interim Operating Agreement does not contemplate (but does not prohibit) Tops from making offers of employment to any of the Store Employees, including, without limitation, management employees.

(b)     <u>Private Sale/No Competitive Bidding</u>.  During its operation of the Stores, Tops will sell Merchandise in the ordinary course of the Stores' business, pursuant to the terms of the Interim Operating Agreement.

(c)     <u>Sale Free and Clear</u>.  The Merchandise will be sold free and clear of all liens, claims, encumbrances and interests, including those arising under or related to labor, employment and collective bargaining agreements, pension, ERISA, tax or other agreements of the Debtors.

(d)     <u>Closing and Other Deadlines</u>. Subject to entry of the Bankruptcy Sale Order, operating the Stores on an interim basis shall commence at the Stores at Closing (the "<u>Interim Operating Agreement Commencement Date</u>") and shall terminate 90 days following the Closing (the "<u>Termination Date</u>").  The period from the Interim Operating Agreement Commencement Date to the Termination Date shall be referred to in the Interim Operating Agreement as the "<u>Term</u>."  The Termination Date may be (a) extended by mutual written agreement of Tops and Merchant; or (b) accelerated by Tops, in which case Tops shall provide Merchant with not less than three (3) days' advance written notice of any such planned accelerated Termination Date.

(e)     <u>Use of Proceeds</u>.  Tops may establish its own accounts, dedicated solely for the deposit of the Proceeds and the disbursement of amounts payable

to Tops hereunder (the "Tops Accounts") and Merchant shall promptly upon Tops' request execute and deliver all necessary documents to open and maintain the Tops Accounts. During the period between the Interim Operating Agreement Commencement Date and the date Tops designates the Tops Accounts, if any ("Merchant Account Usage Period"), all Proceeds of operating the Stores on an interim basis (including credit card proceeds), shall be collected by Tops and deposited on a daily basis into depository accounts designated by Merchant for the Stores, which accounts shall be designated solely for the deposit of Proceeds of operating the Stores on an interim basis (including credit card proceeds), and the disbursement of amounts payable by Tops hereunder (the "Designated Deposit Accounts"). Commencing on the Interim Operating Agreement Commencement Date, and on each business day thereafter, Merchant shall promptly pay to Tops by wire funds transfer all collected funds constituting Proceeds deposited into the Designated Deposit Accounts (but not any other funds, including, without limitation, any proceeds of Merchant's inventory sold prior to the Interim Operating Agreement Commencement Date).

(f)     Relief from Bankruptcy Rule 6004(h). The Debtors seek such relief.

## VII.    THE TRANSITION SERVICES AGREEMENT

35.    Pursuant to the Transition Services Agreement, the Debtors agree to provide Transition Services to Tops during the Term of the Transition Services Agreement in order to facilitate the transfer of the Acquired Assets, according to the terms of the Asset Purchase Agreement. The Transition Services to be provided are detailed on Schedule 1 of the Transition Services Agreement.

36.    The Transition Services Agreement represents the culmination of an extensive negotiation process conducted by the Debtors and their advisors and the Agent and its advisors. In addition, the Transition Services Agreement is an integral part of the overall sale agreement set forth in the Asset Purchase Agreement. If Tops could not guaranty that the Debtors would provide the Transition Services, it would not make economic sense for Tops to consummate the Asset Purchase Agreement.

37.     The transition services are required for the Debtors to provide certain operational issues to the Acquired Stores post-Closing.  The transition services include transitioning employees to be retained by Tops to Tops' payroll system and collective bargaining agreement, among other services to transition the business to Tops.

38.     The Transition Services Agreement represents a culmination of an extensive negotiation process conducted by the Debtors and their advisors and the Agent and its advisors.

## VIII.   THE C&S AGREEMENT

39.     As set forth in more detail in the Stengel Declaration, in December of 2008, the Debtors sold substantially all assets relating to their wholesale grocery business to C&S. Pursuant to this transaction, the Debtors and C&S are parties to several agreements, including an asset purchase agreement, supply agreements, as well as a transition services agreement.

40.     The Debtors, Tops, and C&S have entered into an agreement (the "C&S Agreement") that provides for provision of certain services and the manner by which certain assets, as well as leases and executory contracts between the Debtors and C&S, will be transferred to Tops, or retained by C&S, after the Closing of the Asset Purchase Agreement.  In addition, as provided in more detail below, in exchange for the Debtor entering into the C&S agreement, C&S has agreed to support the transactions set forth in this Motion and has agreed to the reduction of certain claims held by C&S against the Debtors.

41.     The Transition Services Agreement represents a culmination of an extensive negotiation process conducted by the Debtors and their advisors,  Tops and its advisors, and C&S and its advisors.

## IX.     THE AGENCY AGREEMENT

42.     Pursuant to the Agency Agreement, the Debtors seek to appoint Tops as their agent to (a) sell all of the Debtors' Merchandise (as defined in the Agency Agreement), and (b) conduct going out of business sales at the Debtors' stores.

43.     The Agency Agreement represents the culmination of an extensive negotiation process conducted by the Debtors and their advisors and the Agent and its advisors.

### A.     Key Provisions of the Agency Agreement

44.     The following paragraphs in this section summarize key provisions of the Agency Agreement, but are qualified in their entirety by reference to the Agency Agreement.[8]

(a)     Appointment of Agent.  By the Agency Agreement, the Debtors (referred to in the Agency Agreement as the "Merchant"), appoint Agent, and Agent agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale in accordance with the terms and conditions of the Agency Agreement.  Merchant's and Agent's obligations are subject to the approval of the Bankruptcy Court and shall be of no force and effect in the event that the Approval Order (as defined in Section 2.5 of the Agency Agreement) is not entered.

(b)     Payments to Agent.  Subject to entry of the Approval Order, as its compensation for services rendered to Merchant, Agent shall be entitled to all Proceeds of the Sale after payment of the Expenses of the Sale and all other amounts payable to Merchant from Proceeds thereof or otherwise payable to Merchant under the terms of the Agency Agreement.

(c)     Expenses.  Agent shall be responsible for all Expenses incurred in conducting the Sale during the Sale Term, which Expenses shall be paid by Agent in accordance with Section 4.2 of the Agency Agreement.

(d)     Merchandise Subject to the Agency Agreement.  For purposes of the Agency Agreement, "Merchandise" shall mean all finished goods inventory that is owned by Merchant and located at the Stores as of the

---

[8]   Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Agency Agreement, attached hereto as **Exhibit F**, as applicable.

Sale Commencement Date, including Out of Season Merchandise. Notwithstanding the foregoing, "Merchandise" shall not include: (1) goods which belong to sublessees, licensees or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment, or as bailee;; (3) Merchant Consignment Goods; (4) inventory that is designated by Agent to be returned to the vendor and which is accepted by vendor; (5) Spoiled/Unsaleable Merchandise; and (6) Defective Merchandise.

    (e)    <u>Sale Term</u>. Subject to the Approval Order, the Sale shall commence at the Stores on the date of Closing (the "<u>Sale Commencement Date</u>"). The Agent shall complete the Sale, and shall vacate each Store's premises 90 days from the date of Closing (the "<u>Sale Termination Date</u>"). The period from the Sale Commencement Date to the Sale Termination Date shall be referred to herein as the "<u>Sale Term</u>." The Sale Termination Date may be (a) extended by mutual written agreement of Agent and Merchant; or (b) accelerated by Agent, in which case Agent shall provide Merchant with not less than three (3) days' advance written notice of any such planned accelerated Sale Termination Date.

45. In addition to acting as the Debtors' agent for the sale of the Merchandise, the Agency Agreement provides that the Agent will conduct going out of business sales at all of the Debtors' stores, including stores that the Agent is not purchasing (in other words, stores that are not included as Acquired Assets under the Asset Purchase Agreement).

**B.**     **<u>Provisions of the Agency Agreement that May Implicate Local Rule 6004-1(b)(iv)</u>**

46. Pursuant to Local Rule 6004-1(b)(iv), the Debtors are required to highlight certain provisions of this Motion relating to approval of the Agency Agreement, including:

    (a)    <u>Agreements with Management</u>. The Debtors and the Agent shall use certain of the Debtors' employees during the Sale Term (the "<u>Retained Employees</u>"). The Agency Agreement does not contemplate (but does not prohibit) the Agent from making offers of employment to any of the Debtors' employees, including, without limitation, management employees.

    (b)    <u>Private Sale/No Competitive Bidding</u>. The Agent will sell the Merchandise, pursuant to the terms of the Agency Agreement, via Store Closing Sales.

    (c)    <u>Sale Free and Clear</u>. The Merchandise shall be sold free and clear of all liens, claims, encumbrances and interests, including those arising under or

related to labor, employment and collective bargaining agreements, pension, ERISA, tax or other agreements of the Debtors.

(d)    Closing and Other Deadlines.  The Agency Agreement provides that, subject to the Approval Order, the Sale shall commence at the Stores on the date of Closing (the "Sale Commencement Date").  The Agent shall complete the Sale, and shall vacate each Store's premises 90 days from the date of Closing (the "Sale Termination Date").  The period from the Sale Commencement Date to the Sale Termination Date shall be referred to herein as the "Sale Term."  The Sale Termination Date may be (a) extended by mutual written agreement of Agent and Merchant; or (b) accelerated by Agent, in which case Agent shall provide Merchant with not less than three (3) days' advance written notice of any such planned accelerated Sale Termination Date.

(e)    Use of Proceeds.  The proceeds from the sale of the Merchandise (the "Proceeds") shall be distributed in the following order: (i) to satisfy amounts outstanding to the First Lien Secured Lenders; (ii) to satisfy amounts outstanding to the Second Lien Secured Lenders, and (iii) other creditors of the Debtors.

(f)    Relief from Bankruptcy Rule 6004(h).  The Debtors seek such relief.

## X.    THE COMPROMISES AND SETTLEMENTS OF CLAIMS WITH C&S AND THE UFCW PARTIES

### A.    C&S Wholesale Grocers, Inc.

47.    C&S has asserted claims against the Debtors for damages related to alleged breaches of these agreements, as well as for other matters including, but not limited to, allegations of C&S product lost by the Debtors.  C&S asserts that it has a prepetition unsecured claim of approximately $65 million.

48.    If the Debtors enter into the transactions contemplated in this Motion, C&S has agreed to reduce its claim to a prepetition unsecured claim of approximately $25 million (the "C&S Claim Compromise").  As part of the C&S Claim Compromise, the Debtors will reserve their right to object to the C&S's remaining claim.

### B.    THE UFCW PARTIES

49.    The Debtors employ approximately 5,700 persons in their grocery stores, distribution centers, trucking services, and corporate offices.  Approximately 5,300 employees are hourly workers while approximately 450 employees are salaried.  Of its 5,700 employees, approximately 87% of the employees belong to a union.  Ninety-three percent of unionized employees belong to locals of the United Foods and Commercial Workers union.  In addition, as set forth in more detail in the Stengel Declaration, the Debtors are parties to various collective bargaining agreements with the unions.

50.    UFCW Local Pension Fund and UFCW Local One Health Care Fund (collectively, the "UFCW Parties") have asserted claims against the Debtors related to the Debtors' alleged failure to make pension fund payments, as well as other alleged breaches of the collective bargaining agreements with the UFCW Parties.  The UFCW Parties assert claims of approximately $72 million.  If the Debtors enter into the transactions contemplated in this Motion, the UFCW Parties have agreed to waive their claims against the Debtors in full (the "UFCW Claim Compromise," together with the C&S Claim Compromise, the "Compromises of Claims").

### C.    The Compromises of Claims

51.    Settling the claims of C&S and the UFCW Parties is necessary to ensure the support of C&S and the UFCW Parties for the transactions contemplated in this Motion.  The Debtors have analyzed the claims of both C&S and the UFCW Parties and concluded that it is in the best interest of the Debtors' estates to enter into the Compromises of Claims in order to ensure that the transactions with Tops are consummated.  Therefore, pursuant to the legal authority cited below, the Debtors should be permitted to enter into the Compromises of Claims.

## XI    ARGUMENT AND AUTHORITY IN SUPPORT OF THE MOTION

### A.    <u>The Sale of Substantially All the Debtors' Assets</u>

#### (1)    The Sale is Within the Sound Business Judgment of the Debtors and Should be Approved

52.    Bankruptcy Code section 363(b)(1) provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Bankruptcy Code section 363 does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets outside the ordinary course of business prior to confirmation of a plan. However, courts in this Circuit and others have required that the decision to sell assets outside the ordinary course of business be based upon the sound business judgment of the debtors. *See In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143 (3d Cir. 1986); *see also Myers* v. *Martin (In re Martin),* 91 F.3d 389, 395 (3d Cir. 1996); *Comm. of Equity Sec. Holders* v. *Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1071 (2d Cir. 1983); *Dai-Ichi Kangyo Bank, Ltd.* v. *Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.),* 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 176 (D. Del. 1991).

53.    The "business judgment" test requires a debtor to establish four elements in order to justify the sale or lease of property outside the ordinary course of business: (i) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (ii) that adequate and reasonable notice has been provided to interested persons, (iii) that the debtors have obtained a fair and reasonable price, and (iv) good faith. *Abbotts Dairies,* 788 F.2d 143; *Titusville Country Club* v. *Pennbank (In re Titusville Country Club),* 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd.,* 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989). In this case, the Debtors submit that the decision to proceed with the Sale and the Bid Procedures

related thereto are based upon their sound business judgment and should be approved.  A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.,* 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).  Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case. *Lionel*, 722 F.2d at 1071; *Montgomery Ward,* 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

54.     Section 363(b) of the Bankruptcy Code provides, in pertinent part, that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Section 363(b) thus expressly authorizes a debtor in possession to sell estate assets prior to and outside a plan of reorganization. Section 363 is a grant of broad and flexible power to the bankruptcy court grounded in business judgment and practical reality.  *See In re Martin*, 91 F.3d 989, 395 (3d Cir. 1996).  In *Lionel*, 722 F.2d at 1070, the Second Circuit explained its sweep and the precedential standards.  The court began with an historical overview of the bankruptcy provisions that have permitted the sale of a debtor's assets outside a final plan of liquidation or reorganization.  *Lionel*, 722 F.2d at 1066-68. The court noted that initially such sales were permitted only where the property to be sold was "of a perishable nature, or likely to deteriorate in value." *Id*. at 1066 (quoting section 25 of the Bankruptcy Act of 1867, 14 Stat. 517).

55.     However, the standard evolved beyond "perishable" situations, to cases where property might lose value due to a broad range of economic exigencies.  Thus, in *In re Penlow*, 209 F. 841 (2d Cir. 1913), for example, the court authorized a private sale of a stock of

handkerchiefs during the Christmas season, noting that the value of the handkerchiefs "would decline greatly after the holidays." *Lionel*, 722 F.2d at 1067. Still later, the *Lionel* court explained, the principle was further extended to instances where "a good business opportunity was presently available, *so long as the parties could act quickly*." *Lionel*, 722 F.2d at 1069 (citing *In re Sire Plan, Inc.*, 392 F.2d 497 (2d Cir. 1964)) (emphasis added).

56. Ultimately, an even broader standard emerged, as reflected in the seemingly unqualified language of section 363(b). *Lionel*, 722 F.2d at 1069. Under that standard, as articulated in *Lionel*, a bankruptcy judge is afforded "considerable discretion" in determining whether to allow a sale prior to confirmation of a plan, but must "expressly find . . . a *good business reason* to grant such an application." *Lionel*, 722 F.2d 1066, 1071 (emphasis added). *See also In re Montgomery Ward Holding Corp.*, 242 B.R. 147 (D.Del. 1999); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *Licensing By Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169 (D.Del. 1991); *In re Chateaugay Corp.*, 973 F.2d 141, 144 (2d Cir. 1992); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989).

57. Additionally, Bankruptcy Code section 105(a) provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *In re Fesco Plastics Corp.,* 996 F.2d 152, 154 (7th Cir. 1993); *Pincus* v. *Graduate Loan Ctr. (In re*

*Pincus),* 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., Chinichian* v. *Campolongo (In re Chinichian),* 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.,* 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

58.     The Debtors submit that more than ample business justification exists to sell the Acquired Assets to Stalking Horse Bidder or other Successful Bidder pursuant to the Bid Procedures. As set forth more fully above and in the Stengel Declaration, prior to the Petition Date, the Debtors, acting through their board, officers and advisors implemented a marketing and sale process for the assets of the company designed to reach the strategic and financial buyers most likely to have an interest in the Debtors' assets and business. Prior to the Petition Date, the Debtors and their advisors also devoted substantial resources and energy to examining ways in which to restructure leases and other obligations to enhance the viability of the business going forward and to enhance the likelihood of a robust sale process. The vigorous search for such interested parties continued after the Petition Date.

59.     An expedited and targeted postpetition sale process is further justified by exigencies deriving from the current business environment and the specific needs and vulnerabilities of the Debtors' business. The Debtors operate in a highly competitive retail environment, made all the more so by the current adverse macroeconomic conditions. Moreover, the Debtors' business model depends on skilled employees, strong customer confidence and

establishing and maintaining long term customer relationships. Accordingly, the viability of the Debtors' business is particularly vulnerable to the consumer and employee stigma of being perceived as "bankrupt", which will increase the longer the Debtors' business remains in chapter 11. In addition, cash and liquidity for the Debtors' business are very limited. There simply is not enough liquidity available to the Debtors for a more protracted sale process than proposed. Thus, the relief sought herein is not only reasonable, but necessary, to maximize the value of the Debtors' estates for the benefit of their stakeholders.

60. The Notice of Auction and the Sale is designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Acquired Assets. Indeed, the Debtors and their professionals have marketed and will continue to market the Acquired Assets, and have picked a Stalking Horse Bidder after soliciting the most likely interested competing bidders. Accordingly, the proposed Sale satisfies the second prong of the *Abbotts Dairies* standard.

61. The Bid Procedures are designed to maximize the value received for the Acquired Assets. The process proposed by the Debtors allows for a timely and efficient, albeit expedited, auction process, given the circumstances facing the Debtors, while providing bidders with ample time and information to submit a timely competing bid and to perform due diligence. The Bid Procedures are designed to ensure that the Acquired Assets will be sold for the highest or otherwise best possible purchase price. The Debtors are subjecting the value of the Acquired Assets to market testing and permitting prospective purchasers to bid on the Acquired Assets. The proposed Sale is a market check through the solicitation of competing bids in a court-supervised Auction pursuant to the Bid Procedures. Accordingly, the Debtors and all parties in interest can be assured that the consideration received for the Acquired Assets will be fair,

reasonable and the highest and best under the circumstances. Therefore, the third prong of the *Abbotts Dairies* standard is satisfied. As discussed below, the "good faith" prong of the *Abbotts Dairies* standard is also satisfied here.

**(2)  The Immediate Sale of the Debtors' Assets is Necessary to Preserve the Business as a Going Concern - Time is of the Essence**

62.      As the *Lionel* court's discussion of section 363(b) makes clear, the quintessential "good business reason" on which reorganization courts have historically justified the sale of a debtor's property prior to a plan is when any delay in the sale of the property threatens to erode significantly the value of that property. *Lionel*, 722 F.2d at 1066-69; *see also In re V. Loewer's Gambrinus Brewery Co.*, 141 F.2d 747, 749 (2nd Cir. 1944). As the *Lionel* court stated, "[i]n such cases . . . the bankruptcy machinery should not straightjacket the bankruptcy judge so as to prevent him from doing what is best for the estate." *Lionel*, 722 F.2d at 1069.

63.      Thus, courts applying section 363(b) have routinely authorized the sale of a debtor's operating assets in advance of the plan process where the debtor did not have sufficient liquidity to continue operating, and the cessation of operations was likely or certain to result in the debtor's inability to realize the going concern value of its business.[9]

---

[9]    *See, e.g., Stephens Indus. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (approving sale of radio station where debtor lacked funds to continue operations and could lose broadcast license if station went off the air); *In re Brookfield Clothes, Inc.,* 31 B.R. 978 (S.D.N.Y. 1983) (approving sale of clothing manufacturer that had shut down due to lack of cash prior to petition date); *In re Lady H Coal Co., Inc.,* 193 B.R. 233, 244 (Bankr. S.D. W.Va. 1996) (approving sale of coal producer that could not fund operations and was nearly out of cash needed to operate pumps that prevented mines from flooding*); In re WBQ P'ship*, 189 B.R. 97, 102-03 (Bankr. E.D. Va. 1995) (approving sale of nursing homes as necessary to protect going concern value); *In re Weatherly Frozen Food Group, Inc.,* 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992) (approving sale of ice cream producer that lacked cash needed to perform maintenance necessary to continue operations); *In re Titusville Country Club*, 128 B.R. 396, 400 (Bankr. W.D. Pa. 1991) (approving sale of golf course at start of golf season where debtor had inadequate funds to maintain course for the season); *In re Channel One Comm., Inc.,* 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) (approving sale of radio station because of lack of funds needed to continue to operate); *In re Naron & Wagner, Chartered*, 88 B.R. at 90 (Bankr. D. Md. 1988) (approving sale of computer business where debtor was unable to continue operations due to lack of liquidity); *In re Condere Corp.*, 228 B.R. 615, 629 (Bankr. S.D. Miss. 1998) (approving sale of tire plant that needed major capital infusion to reach necessary production levels); *In re Boogaart of Fla., Inc.,* 17 B.R. 480, 483 (Bankr. S.D. Fla. 1981) (approving liquidation of grocer operating at a continual loss).

64.     Time is of the essence in these cases for a number of reasons.  First, the Cash Collateral Order provides that it will be a "Termination Event" if the Debtors fail to consummate the transactions contemplated in this Motion on the schedule set forth herein.  The milestone dates set forth in the Cash Collateral Order, and the Debtors need for continued use of cash collateral, are primarily responsible for the expedited scheduling proposed by the Debtors.  Moreover, the Debtors are operating with very limited resources.  As such, these sale transactions must be approved on the expedited schedule set forth herein, in order to ensure that the Debtors will have access to the sale proceeds as soon as possible.  Given these time constraints, the Debtors have determined that the schedule set forth in this Motion is necessary and appropriate.

> **(3)     The Sale is Proposed in "Good Faith" and the Successful Bidder is Entitled to the Protection of Bankruptcy Code section 363(m)**

65.     The Debtors request that the Court find that the Successful Bidder is entitled to the benefits and protections provided by Bankruptcy Code section 363(m) in connection with the Sale.

66.     Bankruptcy Code section 363(m) provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

67.     Bankruptcy Code section 363(m) thus protects the purchaser of assets sold pursuant to Bankruptcy Code section 363 from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.  By its terms, Bankruptcy

Code section 363(m) applies to sales of interests in tangible and intangible assets, such as the Acquired Assets.

68.     The Debtors will present evidence at the Sale Hearing, if necessary, that the Asset Purchase Agreement was an intensely negotiated and represents arm's-length negotiation between the parties, in which the Stalking Horse Bidder acted in good faith.  There has been no collusion with the Stalking Horse Bidder.  The Debtors and the Stalking Horse Bidder had separate legal counsel and advisors to help negotiate the transaction.  CDG was retained to provide experience personnel such as Chief Restructuring Officer Ron Stengel, among others. The CDG personnel have assisted the Debtors in exploring their strategic alternatives, marketing their business and assets and negotiating transactions, including the disposition of the Assets. The Debtors' bankruptcy counsel is very experienced in negotiating sale transactions in bankruptcy cases.  Moreover, the transaction was unanimously approved and authorized by the Debtors' Board of Directors, with a majority of the board being comprised of independent directors.  The Debtors request that the Court make a finding and ruling that the Asset Purchase Agreement is approved and the Stalking Horse Bidder may sell the Acquired Assets to purchasers in good faith, which shall be entitled to the protection offered by Bankruptcy Code section 363(m).

### (4)     The Sale Satisfies the Requirements of Bankruptcy Code section 363(f)

69.     Under Bankruptcy Code section 363(f), a debtor in possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the

subject of a bona fide dispute; or (v) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest. 11 U.S.C. § 363(f); *Citicorp Homeowners Serv., Inc.* v. *Elliot (In re Elliot),* 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that Bankruptcy Code section 363(f) is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met). Because the Debtors expect that they will satisfy, at minimum, the second and fifth of these requirements, if not others as well, approving the sale of the Acquired Assets free and clear of all adverse interests is warranted. Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically identified in section 363(f). *See, e.g., In re Trans World Airlines, Inc.,* 2001 WL 1820325 at *3, 6 (Bankr, D. Del. March 27, 2001); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.),* 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

70.    Included in the scope of the section 363 sale relief requested herein, the Debtors seek to sell their assets free and clear of any claims and interests relating to or arising under any labor agreements, pension agreements or employment agreements, including, but not limited to, those claims and interests that may be asserted by any parties to any of the collective bargaining agreements where the Debtors are parties. The sale of the Debtors' assets will be dramatically hindered and impaired, and the Debtors' creditors and other interested parties (including the employees and their labor union representatives themselves) will be harmed as a result, unless buyers can purchase the assets free and clear of these kinds of claims and interests. Prospective purchasers will necessarily be more interested in buying the assets on a going concern basis if they are assured that they will not be saddled with legacy liabilities and may bargain a new agreement suited to their needs. Sales pursuant to section 363 are routinely approved by other

courts free and clear of labor and employment and collective bargaining agreements with those claims and interests, if any, attaching to the proceeds generated by the asset sales in whatever priority the law provides.  This is exactly the relief the Debtors seek as part of this section 363 motion. *See, e.g., In re General Motors Corp.* 407 B.R. 463, 509-511 (Bankr. S.D.N.Y. 2009); *In re Family Snacks, Inc.*, 257 BR 884 (B.A.P. 8th Cir. 2001); *In re The Lady H Coal Company, Inc.* 193 B.R. 233 (Bankr. S.D.W.V. 1996); *In re Maxwell Newspapers, Inc.*, 981 F.2d 85 (2d Cir. 1992).

### (5) The Bid Protections to the Stalking Horse Bidder are Reasonable and Appropriate

71.     Approval of the requested Break-Up Fee to the Stalking Horse Bidder is governed by standards for determining the appropriateness of bidding incentives in the bankruptcy context established by the Third Circuit in *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),* 181 F.3d 527 (3d Cir. 1999).  In *In re O'Brien,* the Third Circuit concluded that "the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence.  In other words, the allowability of break-up fees . . . depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate."  *In re O'Brien,* 181 F.3d at 535. Here, the Break-Up Fee should be approved because it will provide a benefit to the Debtors' estates.

72.     In *In re O'Brien,* the Third Circuit referred to nine factors that the bankruptcy court viewed as relevant in deciding whether to award a break-up fee: (1) the presence of self-dealing or manipulation in negotiating the break-up fee; (2) whether the fee harms, rather than encourages, bidding; (3) the reasonableness of the break-up fee relative to the purchase price; (4) whether the "unsuccessful bidder place[d] the estate property in a sales configuration mode to

attract other bidders to the auction"; (5) the ability of the request for a break-up fee "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders"; (6) the correlation of the fee to a maximization of value of the debtor's estate; (7) the support of the principal secured creditors and creditors committees of break-up fee; (8) the benefits of the safeguards to the debtor's estate; and (9) the "substantial adverse impact [of the break-up fee] on unsecured creditors, where such creditors are in opposition to the break-up fee." *See In re O'Brien,* 181 F.3d at 536.

73.     After considering the reasonableness of bidding incentives, courts have approved a range of break-up fees as a percentage of the purchase price as being appropriate under the facts and circumstances of the case. *See In re Chi-Chi's Inc.,* Case No. 03-13063 (Bankr. D. Del. November 4, 2003) (fee of 5.1% permitted); *In re Riverstone Networks,* Case No. 06-10110 (Bankr. D. Del. February 24, 2006) (fee of 3% permitted); *In re Radnor Holdings,* Case No. 0610894 (Bankr. D. Del. September 22, 2006) (aggregate fee and expense reimbursement of 3% permitted); *Tama Beef Packing, Inc.,* 312 B.R. 192 (Bankr. N.D. Iowa 2004) (court noted that typical break-up fees are calculated at 3 to 4% of purchase price and upheld fee of 3.2%); *In re Great Northern Paper, Inc.,* Case No. 03-10048 (Bankr. D. Me. February 18, 2003) (fee of 5.4% plus reimbursement of expenses upheld); *Integrated Resources,* 147 B.R. 650, 662 (S.D.N.Y. 1992) (break-up fee representing up to 3.2% of bidder's out-of-pocket expenses or 1.6% of the proposed purchase price; expert testified that outside of bankruptcy break-up fees average 3.3%); *see also In re Global Motorsport Group, Inc.*, No. 08-10192 (KJC) (Bankr. D. Del. Feb. 14, 2008) (breakup fee of approximately 4% of sale price); *Dura Auto. Sys., Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. July 24, 2007) (break-up fee of 2% of sale price and expense reimbursement of 1% of sales price); *In re Tweeter Home Entm't Group, Inc.*, Case No. 07-

10787 (PJW) (Bankr. D. Del. June 26, 2007) (authoring debtors to offer up to 3% break-up for sale transaction)

74.     Whether evaluated under the "business judgment rule" applied by many courts or the Third Circuit's "administrative expense" standard, the requested Break-Up Fee should be approved because it is necessary to obtain the maximum return for the benefit of the Debtors' estates.   All negotiations between the Debtors and the Stalking Horse Bidder have been conducted in good faith, and at arm's-length basis.  Absent authorization of the payment of the Break-Up Fee, the Debtors might lose the opportunity to obtain the highest and best available offer for the Acquired Assets and the downside protection that will be afforded by the Asset Purchase Agreement.

75.     Payment of the Break-Up Fee is not likely to diminish the Debtors' estates, rather the Asset Purchase Agreement and the Stalking Horse Bidder's offer will form the basis upon which other bids may be submitted and evaluated.  The approval of the Break-Up Fee permits the Debtors to insist that competing bids for the Acquired Assets be higher or otherwise better than the purchase price under the Asset Purchase Agreement, which is a clear benefit to the Debtors' estates.  Thus, even if the Stalking Horse Bidder is offered the Break-Up Fee and is ultimately not the Successful Bidder, the Debtors will still have benefited from the higher floor established by improved bids and thereby increase the likelihood that the price at which the Acquired Assets are sold reflects their true worth.

76.     Given the exigencies of the Debtors' financial condition and the current state of the national credit markets, the Break-Up Fee is not only necessary, but reasonable.  Paying a Break-Up Fee is reasonable since the Stalking Horse's bid provides benefits to the Debtors' estates that will be realized by having a signed purchase agreement, enabling the Debtors to

preserve the value of their estates and promote more competitive bidding, ample support exists for the approval of the Break-Up Fee.

77.      The Debtors' payment of the Break-Up Fee under the circumstances described herein would be (i) an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of Bankruptcy Code section 503(b); (ii) of substantial benefit to the Debtors' estates; and (iii) reasonable and appropriate in light of the efforts and the significant due diligence costs and expenses that have been and will be expended by the Stalking Horse Bidder. The Debtors have demonstrated sound business justification and legal for authorizing the requested Break-Up Fee.

78.      In addition to the Break-Up Fee, the Bid Procedures contemplate an overbid protection in the form of a minimum bid increment beyond the consideration currently proposed in the Stalking Horse Bidder.  Namely, a Qualified Bid must provide for an initial minimum bid amount equal to the sum of (i) the Purchase Price, (ii) the Break-Up Fee and (iii) $1,000,000 (the "Minimum Initial Bid").  All subsequent bids shall be made in increments of $250,000.  The Debtors submit that, given the value of this transaction, the minimum initial incremental overbid amount is reasonable and appropriate under the circumstances, will enable the Debtors to simultaneously maximize the value for the Acquired Assets while limiting the chilling effect in the marketing process and is consistent with the overbid increments previously approved by courts in this district.  *See, e.g., Dura Auto. Sys., Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. July 24, 2007) (approving $750,000 increment); *New Century TRS Holdings, Inc.*, No. 07-10416 (KJC) (Bankr. D. Del. Apr. 20, 2007) (approving $500,000 increment); *Three A's Holdings, L.L.C.*, No. 06-10886 (BLS) (Bankr. D. Del. Sept. 7, 2006) (approving $500,000 increment).

### (6) The Cure Procedures Provide Adequate Notice and Opportunity to Object and Should be Approved

79.     Bankruptcy Code section 365(a) provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. *See, e.g., In re Stable Mews Assoc., Inc.,* 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. *See Group of Institutional Investors* v. *Chicago, Milwaukee, St. Paul & Pacific R.R. Co.,* 318 U.S. 523 (1943); *Sharon Steel Corp.,* 872 F.2d 36, 39-40 (3d Cir. 1989). The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp.* v. *West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.),* 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *Stable Mews Assoc.,* 41 B.R. at 596). Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. *See Richmond Leasing Co.* v. *Capital Bank, NA.,* 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to Bankruptcy Code section 365(b)(1), for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

80.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract. *See In re Rickel Home Centers, Inc.,* 209 F.3d 291, 299 (3d Cir.

2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *see also In re Headquarters Dodge, Inc.,* 13 F.3d 674,682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

81.     Bankruptcy Code section 365(f) provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc.* v. *Arrari (In re Carlisle Homes, Inc.),* 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.,* 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *Accord In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

82.     Additionally, Bankruptcy Code section 105(a) provides a bankruptcy court with broad powers in the administration of a case under title 11. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. *See In re Fesco Plastics Corp.,* 996 F.2d 152, 154 (7th Cir.

1993); *Pincus* v. *Graduate Loan Ctr. (In re Pincus),* 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. *See, e.g., In re Chinichian,* 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code"); *In re Cooper Props. Liquidating Trust, Inc., 61* B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of their creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws").

83.     The Debtors respectfully submit that the proposed Cure Procedures are appropriate and reasonably tailored to provide non-Debtor parties to Acquired Contracts with adequate notice, in the form of the Cure Notice, of the proposed assumption and/or assignment of their applicable contract or lease, as well as proposed Cure Amounts, if applicable.  Such non-Debtor parties to the Acquired Contracts will then be given an opportunity to object to such notice.  The Cure Procedures further provide that, in the event an objection is not resolved, the Court will determine related disputed issues (including any adequate assurance of future performance issues).  Accordingly, the Debtors submit that legal and factual bases exist to support the proposed Court's opinion of the proposed Cure Procedures.

**B.     The Interim Operating Agreement**

84.     The Debtors further seek Court authorization of the Interim Operating Agreement between the Debtors and Tops.  The Interim Operating Agreement sets forth the terms upon which the Agent will operate the Debtors' Stores during the 90-day period after Closing (the

"IOA Term"). During the IOA Term, the Agent will determine whether to designate certain leases as included in the leases that the Debtors will assume and assign to the Agent.

85. The Interim Operating Agreement is an integral part of the overall sale agreement set forth in the Asset Purchase Agreement. Tops would not have entered into the Asset Purchase Agreement without being given the opportunity to determine which leases it will assume, as provided in the Interim Operating Agreement. Likewise, the Debtors require that Tops operate the stores during the IOA Term. As such, for the reasons cited as the basis for authorizing the Debtors to enter into the Asset Purchase Agreement, and pursuant to the legal authorities cited above, the Debtors should be authorized to enter into the Interim Operating Agreement.

**C.     The Transition Services Agreement**

86. The Debtors further seek Court authorization of the Transition Services Agreement between the Debtors and Tops. The Transition Services Agreement will require the Debtors to provide certain services (the "Transition Services") to Tops for a period of time in order to facilitate the transfer of the Acquired Assets, according to the terms of the Asset Purchase Agreement.

87. The Transition Services to be provided to Tops by the Debtors, pursuant to the terms of the Transition Services Agreement, is an integral part of the overall sale agreement set forth in the Asset Purchase Agreement. If Tops could not guaranty that the Debtors would provide the Transition Services, it would not make economic sense for Tops to consummate the Asset Purchase Agreement. As such, for the reasons cited as the basis for authorizing the Debtors to enter into the Asset Purchase Agreement, and pursuant to the legal authority cited above, the Debtors should be authorized to enter into the Transition Services Agreement.

**D.     The C&S Agreement**

88.     The Debtors' further seek Court authorization of the C&S Agreement.  The C&S Agreement provides for the manner by which certain services will be provided and how certain assets, as well as leases and executory contracts between the Debtors and C&S, will be transferred to Tops, or retained by C&S, after the Closing of the Asset Purchase Agreement.

89.     The C&S Agreement involves how Tops will acquire, or not acquire, certain assets and therefore is an integral part of the transactions contemplated in this Motion.

### E.     The Agency Agreement

#### (1)     Selling the Merchandise Under Bankruptcy Code section 363 is Within the Business Judgment of the Debtors

90.     Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. section 363(b)(1).  Courts have uniformly held that approval of a proposed sale of property under section 363(b)(1) is appropriate where the transaction is consistent with the debtor's reasonable business judgment.  *See In re Lionel Corp.*, 722 F.2d 1063, 1070-71 (2d Cir. 1983); *see also In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153-55 (D. Del. 1999) (citing *Lionel*); *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991) (same).

91.     The Debtors seek authority to sell the Merchandise free and clear of all liens, claims, encumbrances and interests, including those arising under or related to labor, employment and collective bargaining agreements, pension, ERISA, tax or other agreements of the Debtors, pursuant to Bankruptcy Code sections 363(b) and 363(f).  As provided above, the Agent's offer to sell the Merchandise, pursuant to the terms of the Agency Agreement, is the highest and best offer received by the Debtors for the purchase of the Merchandise.  In the

Debtors' business judgment, consummation of the proposed sale of the Merchandise is in the best interest of their bankruptcy estates and creditors.

> **(2)** **The Merchandise is Eligible to be Sold Free and Clear of Liens, Claims, Encumbrances and Interests – Bankruptcy Code section 363(f)**

92.     Bankruptcy Code section 363(f) provides that a debtor may sell or otherwise transfer property outside the ordinary course of business free and clear of any interest in such property if:

> 1.     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> 2.     such entity consents;
>
> 3.     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> 4.     such interest is in bona fide dispute; or
>
> 5.     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).  Because section 363(f) is drafted in the disjunctive, only one of the specified conditions need be met for a sale free and clear of interests.

93.     As made clear by the statute, under section 363(f)(2), a bankruptcy debtor may sell estate property free and clear of interests where the interest holders consent to such a sale. 11 U.S.C. § 363(f)(2).  The requisite consent may either be express or implied from the circumstances surrounding the sale.  The proceeds from the sale of the Merchandise will be applied toward the claims of the Prepetition Secured Lenders (as that term is defined in the Stengel Declaration).  As such, the Debtors anticipate that the Prepetition Secured Lenders, as well as any other secured creditor with consensual liens on the Merchandise, will consent to the sale.

94. To the extent that any creditor with an interest in the Merchandise received notice of this Motion and does not file any objections, such creditor should be deemed to have implicitly consented to the contemplated transactions. *See Veltman v. Whetzal*, 93 F.3d 517 (8th Cir. 1996) (failure to object to proposed sale, coupled with agreement to stipulate regarding authority to sell free of interest, constituted consent to the sale free and clear of interests); *Hargrove v. Pemberton (In re Tabore, Inc.)*, 175 B.R. 855 (Bankr. D.N.J. 1994) (failure to object to notice of sale or attend hearing deemed consent to sale for purposes of § 363); *In re Shary*, 152 B.R. 724 (Bankr. N.D. Ohio 1993) (failure to object to transfer of liquor license issued by state constituted consent to sale). Therefore, either expressly or implicitly, the requirements of section 363(f)(2) for the sale or transfer of the Merchandise free and clear of interests will be satisfied.

95. The Debtors reserve the right to submit evidence of the satisfaction of the other elements of section 363(f) at the hearing on this Motion, to the extent necessary to support the sale of the Merchandise free and clear.

> **(3)** **The Store Closing Sales are Necessary to Maximize the Value Received for the Merchandise and the Court Should Waive Compliance with any State and Local Laws, Rules and Ordinances Restricting Store Closing Sales**

96. The Agent will sell the Merchandise via Store Closing Sales conducted at the all of the Debtors' stores. The procedures for the Store Closing Sales are set forth in Section 8 of the Agency Agreement. Many state and local laws, statutes, rules and ordinances require special and cumbersome licenses, waiting periods, time limits and other procedures for store closing, liquidation or similar sales conducted outside of bankruptcy. In addition, some states and localities have statutes or regulations requiring creditor notification before a company conducts a bulk sale. By virtue of 28

U.S.C. § 1334, this Court has exclusive jurisdiction over the Debtors' property wherever located. 28 U.S.C. § 1334. In the context of bankruptcy cases, therefore, when creditors receive notice of the proposed sale, as well as opportunity to be heard in this Court, enforcement of such statutes and regulations is redundant and unnecessary.

97.     The Bankruptcy Code and bankruptcy law preempt state and local laws that conflict with the underlying policies of the Bankruptcy Code. *See Belculfine v. Aloe (In re Shenango Group, Inc.),* 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code . . . state statute cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code."), *aff'd,* 112 F.3d 633 (3d Cir. 1997). While preemption of state law is not always appropriate, *see Baker & Drake, Inc.* v. *Public Serv. Comm'n of Nev. (In re Baker & Drake, Inc.),* 35 F.3d 1348, 1353-54 (9th Cir. 1994) (holding that Bankruptcy Code did not preempt state law prohibiting taxicab leasing that was promulgated in part as public safety measure), preemption is appropriate where, as here, the only state laws involved concern *economic regulation* rather then the protection of public health and safety. *See id.* at 1353 (finding that "federal bankruptcy preemption is more likely . . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety"); *see also In re Scott Housing Sys. Inc.,* 91 B.R. 190, 196-97 (Bankr. S.D. Ga. 1988) (holding that automatic stay under section 362 is broad and preempts state law except for those laws designed to protect public health and safety).

98.     In the instant case, state and local licensing requirements, time limits or bulk sale restrictions on liquidation sales would undermine the fundamental purpose of Bankruptcy Code

section 363(b) by placing constraints on the Debtors' ability to marshal and maximize estate assets for the benefit of creditors.

99.     Accordingly, authorizing the Store Closing Sales without the necessity of, and the delay associated with, obtaining various state and local licenses, observing state and local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising and the like is necessary and appropriate.  Similarly, waiver of any bulk sales laws is appropriate as the notice provided by this Motion and the jurisdiction of this Court provides ample protection for creditors.

100.     It also necessary that any action by any lessor or any federal, state or local agency, department or governmental authority or any other entity to prevent, interfere with, or otherwise hinder consummation of the Store Closing Sales or advertisement of such sales be enjoined.  *See Missouri* v. *United States Bankruptcy Court,* 647 F.2d 768, 776 (8th Cir. 1981) (same), *cert. denied*, 454 U.S. 1162 (1982) (holding that attempt to enforce state regulations governing liquidation of grain warehouses directly conflicted with bankruptcy court's control over property of debtor's estate and therefore violated automatic stay).

101.     The requested waiver is narrowly tailored to facilitate the successful consummation of the Store Closing Sales.  The Debtors do not seek a general waiver of all state and local requirements, but only those that apply specifically to liquidation sales.  The Debtors fully intend to be bound by and comply with all state and local laws pertaining to health and safety, and will require that the Agent do the same.

102.     Similar relief has been granted in other bankruptcy cases in this District.  *See, e.g., In re Gottschalks, Inc.*, Ch. 11 Case No. 09-10157 (Bankr. D. Del., April, 1, 2009) (order approving agency agreement and store closing sales, and granting other related relief); *In re*

*Linens Holding Co.*, Ch. 11 Case No. 08-10832 (Bankr. D. Del. October 16, 2008) (order authorizing, among other things, agent to conduct store closing sales); *In re Mervyn's Holdings, LLC*, Ch. 11 Case No. 08-11586 (Bankr. D. Del. August 28, 2008) (order approving agency agreement and store closing sales, and granting other related relief); *In re Tweeter Home Entm't Group, Inc.*, Ch. 11 Case No. 07-10787 (Bankr. D. Del. July 13, 2007) (final order authorizing debtor to continue store closing sales pursuant to store closing agreement); *In re Three A's Holdings, L.L.C.*, Ch. 11 Case No. 06-10886 (Bankr. D. Del. Sept. 25, 2006) (order authorizing, among other things, agent to conduct store closing sales); *In re MTS Inc., et al,* Ch. 11 Case No. 04-10394 (BLS) (Bankr. D. Del. Mar. 2, 2004) (same); *In re Zany Brainy, Inc. et. Al,* Ch. 11 Case No. 01-1749 (MFW) (Bankr. D. Del. Oct. 11, 2001) (opinion by Robinson, D.J.) (same).

103.     Certain of the leases governing the premises of certain of the Debtors' stores (the "Leases") may contain provisions purporting to restrict or prohibit the Debtors from conducting going-out-of business, store closing, liquidation or similar sales (including the manner of advertising such sales).  Such provisions impose an impermissible restraint on a debtor's ability to maximize the value of its assets under Bankruptcy code section 363 and are therefore unenforceable in chapter 11 cases.  See, e.g., *In re R.H. Macy & Co., Inc.*, 170 B.R. 69, 77 (Bankr. S.D.N.Y. 1994) (holding restrictive lease provisions unenforceable in chapter 11 case when debtor sought to conduct going-out-of-business sale); *In re Ames Dept. Stores, Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) ("[T]o enforce the anti-GOB sale clause of the Lease would contravene overriding federal policy requiring Debtor to maximize estate assets by imposing additional constraints never envisioned by Congress."); *In re Tobago Bay Trading Co.,* 112 B.R. 463, 467 (Bankr. N.D. Ga. 1990) (finding that Debtors' efforts to reorganize would be significantly impaired to detriment of creditors if lease provisions prohibiting debtor from

liquidating its inventory were enforced); *In re Libson Shops, Inc.*, 24 B.R. 695, 693 (Bankr. E.D. Mo. 1982) (holding restrictive lease provisions unenforceable in chapter 11 case when debtor sought to conduct going-out-of-business sale).

104.     Accordingly, no clause in any of the Leases should act as an impediment to the Debtors' conducting the Store Closing Sales or any activities connected with them, including without limitation the manner of advertising the Store Closing Sales.   To the extent that they exist, the Debtors request that the Court grant the Agent and the Debtors authority to conduct the Store Closing Sales without complying with such restrictive lease provisions, and further enjoin the lessors from interfering with or otherwise restricting the Agent or the Debtors from conducting the Store Closing Sales or seeking to recover damages for breach of the restrictive provisions.

105.     Bankruptcy courts have granted authority to avoid restrictive lease provisions in numerous chapter 11 cases. *See In re Gottschalks, Inc.*, Ch. 11 Case No. 09-10157 (Bankr. D. Del., April, 1, 2009); *In re Linens Holding Co.*, Ch. 11 Case No. 08-10832 (Bankr. D. Del. October 16, 2008); *In re Mervyn's Holdings,* LLC, Ch. 11 Case No. 08-11586 (Bankr. D. Del. August 28, 2008); *In re Tweeter Home Entm't Group, Inc.*, Ch. 11 Case No. 07-10787 (Bankr. D. Del. July 13, 2007); *In re Three A's Holdings, L.L.C.*, Ch. 11 Case No. 06-10886 (Bankr. D. Del. Sept. 25, 2006); *In re Ames Department Stores, Inc,* Ch. 11 Case No. 01-42217 (Bankr. S.D.N.Y., August, 2001); *In re Bradlees Stores, Inc.,* Ch. 11 Case No. 00-16033; *In re Drug Emporium, Inc.*, Ch. 11 Case No. 01-4066 (Bankr. N.D. Ohio, E. Div., March, 2001); *In re Phar-Mor, Inc.*, Ch. 11 Case No. 01-44007 (N.D. Ohio, E. Div., March, 2001).

106.     Section 363(b) of the Bankruptcy Code provides that a debtor "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the

estate." *See In re Ames Dept. Stores, Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (noting that "going-out-of-business" sales are governed by section 363(b)). To obtain court approval to use property under section 363(b) of the Bankruptcy Code for the purpose of a store closing sale, debtors need only show a legitimate business justification for the proposed action. See, e.g., *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing Fulton State Bank v. Schipper (In re Schipper), 993 F.2d 513, 515, (7th Cir. 1991)); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (7th Cir. 1983) (same); *In re Delaware and Hudson Rv. Co.*, 124 B.R. 169 (D. Del. 1991) (noting that Third Circuit has adopted "sound business judgment" test for section 363(b) asset sales).

F.     **The Compromise and Settlement of Claims Between the Debtors and (A) C&S  and (B) the UFCW Parties**

107.    The Debtors are also seeking an Order, pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, approving the Compromises of Claims between the Debtors and (A) C&S, and (B) the UFCW Parties.

108.    Section 105(a) of the Bankruptcy Code provides, in pertinent part, that "[t]he court may issue any order . . . that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code.]" 11 U.S.C. § 105(a).

109.    Bankruptcy Rule 9019 provides, in pertinent part, that, "on motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). Under this authority, the Third Circuit has emphasized that "[c]ompromises are favored in bankruptcy." *Myers. v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996). In addition, the District of Delaware has recognized that the approval of a proposed compromise and settlement is committed to the sound discretion of the Bankruptcy Court. *See In re Corman Healthcare Corp.*, 315 B.R. 321, 330 (Bankr. D. Del. 2004).

110.     Before approving a settlement under Bankruptcy Rule 9019, a court must determine whether "the compromise is fair, reasonable, and in the interest of the estate." *In re Key3Media Group, Inc.*, 336 B.R. 87, 92 (Bankr. D. Del. 2005); *In re Marvel Entm't Group*, 222 B.R. 243, 249 (D. Del. 1998) (*quoting In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)); *see also In re Nutritional Sourcing Corp.*, 398 B.R. 816, 833 (Bankr. D. Del. 2008).  Basic to the process of evaluating proposed settlements is "the need to compare the terms of the compromise with the likely rewards of litigation." *Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968).  The court's obligation is to "canvass the issues and see whether the settlement falls below the lowest point in a range of reasonableness." *Travelers Cas. & Sur. Co. v. Future Claimants Representative*, No. 07-2785, 2008 WL 821088, at *5 (D.N.J. Mar. 25, 2008) (*citing In re Jasmine, Ltd.*, 258 B.R. 119 (D.N.J. 2000)); *Coram*, 315 B.R. at 330; *Official Unsecured Creditors' Comm. of Pa. Truck Lines v. Pa. Truck Lines, Inc.*, 150 B.R. 595, 598 (E.D. Pa. 1992).  The court need not be convinced that the settlement is the best possible compromise in order to approve it.  *Coram*, 315 B.R. at 330.  In determining whether a proposed settlement is fair, reasonable, and in the interest of the estate, a court considers "(1) the probability of success in the litigation, with due consideration for the uncertainty in fact and law; (2) the complexity and duration and any attendant expense, inconvenience and delay; and (3) all other factors bearing on the wisdom of the compromise." *Matter of Cajun Elec. Power Co-op, Inc.*, 119 F.3d 349, 356 (5th Cir. 1997).

111.     Applying these principles to the instant matter, the Debtors submit that the Compromises of Claims is in the best interests of the Debtors, their estates and their creditors and should be approved.  Pursuant to the Compromises of Claims, C&S and the UFCW Parties will agree, to support all of the relief sought in this Motion.  Without such support, the Debtors

would not be in a position to take consummate the sale transactions with Tops. The result would be that the Debtors' creditors would ultimately receive significantly less than if the Debtors had not entered into the Compromises of Claims.

112. As to C&S specifically, the Debtors are further seeking that the Court authorize the Debtors to enter into the C&S Agreement between the Debtors, Tops, and C&S. The C&S Agreement provides for the manner by which certain assets, as well as leases and executory contracts between the Debtors and C&S, will be transferred to Tops, or retained by C&S, after the Closing of the Asset Purchase Agreement.

113. Applying these facts to the principles set forth in the case law discussed above demonstrates that the Compromises of Claims should be accepted. First, the Debtors believe that if they were to litigate the issue of the claim amounts with C&S and the UFCW Parties, the Debtors' position would ultimately prevail. However, the Debtors recognize the uncertainty associated with any litigation. Second, while the Debtors believe that litigation may result in a decrease in the ultimate allowed amount of these claims, the Debtors do not believe that this would be the best use of their limited resources. Such litigation would not only consume the Debtors' financial resources, but could potentially delay any distribution to the Debtors' other creditors. Third, even if the Debtors were ultimately successful in reducing the amount of the claims, it would come at the cost of losing C&S and UFCW Parties' support for the sale transactions with Tops, which the Debtors have determined is the best way to maximize value for their creditors.

114. In light of the foregoing, the Debtors believe that the Compromises of Claims as set forth in this Motion are the preferable method for settling these claims. The Debtors therefore assert that the Compromises of Claims, including the C&S Agreement, should be

approved by the Court as they are in the best interests of the Debtors, their estates and their creditors.

## XII.   RELIEF FROM THE FOURTEEN-DAY WAITING PERIOD UNDER BANKRUPTCY RULE 6004(h) AND 6006(d) IS APPROPRIATE

115.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." The Debtors request that the forthcoming Sale Order be effective immediately by providing that the ten (10) day stay under Bankruptcy Rule 6004(h) is waived.

116.    The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to fed. r. bankr. p. 6004(h). Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten (10) day stay period, the leading Bankruptcy treatise suggests that the ten (10) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIERS ON BANKRUPTCY 15TH ED. REV., ¶ 6004.10 at 6004-18 (L. King, 15th rev. ed. 2008). The treatise further provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

117.    As described above, time is clearly of the essence. The troubled economic environment, coupled with particular vulnerabilities of the Debtors service intensive and long term customer relationship oriented business model, enhanced with the threat of liquidation means that the Debtors' assets and business are at significant risk of losing value if the Asset Purchase Agreement is not promptly approved or if a prompt closing of the Sale cannot be

accomplished.  A prompt closing of the Sale is therefore of critical importance and the Debtors request that the Court waive the ten-day stay period under Bankruptcy Rule 6004(h).

## XIII.   NOTICE

118.   Notice of this Motion has been provided to: (i) Tops; (ii) the Office of the United States Trustee; (iii) counsel for the Official Committee of  Unsecured Creditors; (iv) counsel for the Agents for the Prepetition Secured Lenders; (v) entities known to hold or assert a security interest in or lien against any of the Acquired Assets; (vi) all potential bidders known to the Debtors; (vii) all of the Debtors' landlords and tenants (viii) those parties requesting notice pursuant to Bankruptcy Rule 2002, in accordance with Local Rule 2002-1(b).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## XIV.   NO PRIOR REQUEST

119.   No prior motion for relief requested herein has been made to this Court.

*[Remainder of Page Intentionally Left Blank]*

# XV.    CONCLUSION

WHEREFORE, the Debtors respectfully request: (i) entry of the proposed Bid Procedures Order, substantially in the form attached hereto as **Exhibit A**; (ii) such other and further relief as the Court deems just and proper.

Dated: January 8, 2010　　　　　　　MORRIS, NICHOLS, ARSHT & TUNNELL LLP
　　　　Wilmington, Delaware

By: */s/ Ann C. Cordo*_____
Eric D. Schwartz (Del. No. 3134)
Gregory W. Werkheiser (Del. No. 3553)
Ann C. Cordo (Del. No. 4817)
1201 North Market Street, 18th Floor
P.O. Box 1347
Wilmington, Delaware  19899-1347
Telephone: 302.658.9200
Facsimile: 302.658.3989
eschwartz@mnat.com
gwerkheiser@mnat.com
acordo@mnat.com

-and-

HAYNES AND BOONE, LLP
Lenard M. Parkins (NY 4579124)
Michael E. Foreman (NY 2043248)
Abigail Ottmers (TX 24037225)
1221 Avenue of the Americas, 26th Floor
New York, NY 10020
Telephone: 212.659.7300
Facsimile:  212.918.8989
lenard.parkins@haynesboone.com
michael.foreman@haynesboone.com
abigail.ottmers@haynesboone.com

***Counsel for the Debtors and Debtors in Possession***